UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SILTRONIC CORPORATION,
a Delaware Corporation,

        Plaintiff,

v.

EMPLOYERS INSURANCE COMPANY OF
WAUSAU, a Wisconsin Corporation;
GRANITE STATE INSURANCECOMPANY,
a Pennsylvania Corporation; CENTURY
INDEMNITY COMPANY, a Pennsylvania
Corporation; and FIREMAN'S FUND
INSURANCE COMPANY, a California
Corporation,

        Defendants.

Case No. 3:11-cv-1493-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

In order to allocate financial responsibility pursuant to the terms and conditions of various insurance policies, plaintiff, Siltronic Corporation ("Siltronic"), brings this action for declaratory judgment and breach of contract against the following defendants: Employers Insurance Company of Wausau ("Wausau"), Granite State Insurance Company ("Granite State"), Century Indemnity Insurance Company ("Century Indemnity"), and Fireman's Fund Insurance Company ("Fireman's Fund"). Siltronic purchased liability insurance policies from defendants which provide coverage for costs incurred in defending against claims by third parties, including

1 – OPINION AND ORDER

claims for property damage. Complaint (docket #1), ¶ 8. Between August 17, 1978 and January 1, 1986, Siltronic obtained its commercial liability coverage from Wausau. *Id*, ¶ 9. During this period, with the exception of one year (1985), Granite State provided umbrella liability coverage. *Id*. From 1980 through 1985, Siltronic obtained blanket excess coverage from either Century Indemnity (1981) or Fireman's Fund (1980, 1982-85). *Id*.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Siltronic has filed a Motion for Partial Summary Judgment (docket #50) on the limited issue of whether Wausau has a continuing obligation to defend covered environmental claims after exhausting its indemnity coverage under six policies covering 1980-86. For the reasons set forth below, the motion is DENIED.

## BACKGROUND

Siltronic owns real property located at 7200 NW Front Avenue ("Property") on the southwest shore of the Willamette River in a "heavy industrial" area. Complaint, ¶¶ 1, 19. The Property is surrounded on three sides by other industrial properties, including an area owned by the Northwest Natural Gas Company ("NW Natural"). *Id*, ¶ 19.[1] Siltronic operates a silicon wafer manufacturing plant at the Property. *Id*, ¶ 1. On or about December 2000, a 5½ mile section of the Willamette River, a portion of which is immediately adjacent to the Property, was placed on the Superfund List by the United States Environmental Protection Agency ("EPA"). *Id*, ¶ 19. The Superfund area has since been expanded to include 10 river miles and is known as

---

[1] The Property was once owned by the Portland Gas and Coke Company ("GASCO"), which also owned adjacent property and operated an oil gasification plant there until 1956. Burr Decl. (docket #52), Ex. 1, pp. 1-2. In 1958 GASCO became NW Natural, and in 1962 NW Natural sold the portion of the GASCO property that is now owned by Siltronic to an unknown entity. *Id*. Siltronic acquired the Property in 1978. *Id*, p. 1.

the Portland Harbor Superfund Site; the Property is located adjacent to the approximate center of this area. *Id*.

Siltronic purchased six consecutive Commercial General Liability policies from Wausau for the years 1980-1986. *Id*, ¶¶ 8-9; Wausau's Answer (docket #31), ¶¶ 8-9.[2] Each of the six policies provides $1 million in liability limits, for a total of $6 million of available liability coverage. Burr Decl. (docket #52), ¶ 2. Each policy also provides separate coverage for defense costs. *Id*. The provision at issue is the same in each of the Wausau policies and provides the following coverage for property damage:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Complaint, Ex. A, p. 89.[3]

On October 4, 2000, the Oregon Department of Environmental Quality ("DEQ") issued an Order ("2000 DEQ Order") to Siltronic and its neighbor, NW Natural, requiring them to conduct a "remedial investigation" of the Property and "implement source control measures" as deemed necessary by that investigation. *Id*, ¶ 20; Burr Decl., ¶ 3, Ex. 1. This Order made various findings of fact and conclusions of law and noted that Siltronic and NW Natural had refused one or more requests to perform remedial and source control measures. Burr Decl.,

---

[2] Wausau also issued a policy covering the period August 17, 1978, to January 1, 1980, which is not the subject of this motion.

[3] The parties have not submitted complete copies of the numerous insurance policies at issue, but have included excerpts of all the policies as Exhibit A to the Complaint. This same clause also appears in the excerpted policies in Exhibit A.

3 – OPINION AND ORDER

Ex. 2, pp. 4-5. It required Siltronic and NW Natural to conduct removal and remediation actions, source control measures, and additional measures necessary to address the release or threatened release of hazardous substances. *Id*. It also required Siltronic and NW Natural to provide written notice of intent to comply within 10 days. *Id*, p. 5.

On December 8, 2000, the EPA issued a Notice of Potential Liability ("2000 EPA Notice") which deemed Siltronic a potentially responsible party ("PRP") for sediment contamination then alleged to exist in a designated section of the Willamette River. Complaint, ¶ 21; Burr Decl., ¶ 4, Ex. 2. This Notice also stated that Siltronic might "be ordered to perform response actions deemed necessary by EPA or DEQ" and "to pay for damages to, destruction of or loss of natural resources, including the costs of assessing such damages." Burr Decl., Ex. 2, p. 1. It advised that the next step would be the negotiation of an Administrative Order on Consent with "willing PRPs for the performance [of] a Remedial Investigation/Feasibility Study." *Id*, p. 2.

On September 28, 2001, the EPA issued an Administrative Order on Consent for Remedial Investigation/Feasibility Study ("2001 EPA Administrative Order"), entered into with a number of PRPs, including Siltronic. Complaint, Ex. F, p. 10.

On June 23, 2003, Siltronic notified Wausau of the EPA and DEQ actions against it. *Id*, ¶ 26, Ex. B. Wausau, though its administrator, Nationwide, agreed to pay Siltronic's defense costs subject to a reservation of rights. *Id*, Ex. C; Moore Decl. (docket #58), ¶ 3. Beginning on or about September 2003, Wausau began paying Siltronic's costs incurred in response to the EPA and DEQ demands. Complaint, ¶ 29; Moore Decl., ¶ 4. As part of this process, Nationwide segregated or accounted for the payments as either "defense" or "indemnity" payments. Complaint, ¶ 29.

4 – OPINION AND ORDER

On February 5, 2004, DEQ issued an Order ("2004 DEQ Order") requiring Siltronic to perform additional remedial investigations and conduct additional source control measures. *Id*, ¶ 22; Burr Decl., ¶ 5, Ex. 3. This Order specifically targeted for remedial investigation the discovery of releases of trichloroethene ("TCE") and its degradation byproducts, and required Siltronic to identify and implement source control measures for unpermitted discharges or releases of TCE and its associated hazardous substances into the Willamette River. *Id*, p. 1. It also required Siltronic to provide written notice of its intent to comply within 10 days. *Id*, p. 4.

On February 17, 2004, Siltronic responded to the 2004 DEQ Order by providing its Notice of Intent to Comply ("2004 Intent to Comply with DEQ"). Barber Decl. (docket #57), Ex. B. Siltronic agreed to "perform such Remedial Investigation and Source Control Measures and additional measures as set forth [in the 2004 DEQ Order] or are otherwise required to identify, assess and implement source control measures, as appropriate, with respect to TCE and the hazardous substances associated with TCE as may be located on the Siltronic Property[.]" *Id*, p. 1.

On April 27, 2006, EPA, Siltronic, and the other PRPs entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/ Feasibility Study ("2006 EPA Settlement Agreement") which amended the 2001 EPA Administrative Order. Complaint, Ex. F, p. 10.

In September or October 2006, DEQ, Siltronic, and the other PRPs entered into a Consent Judgment ("2006 DEQ Consent Judgment") to resolve the PRPs' liability for certain

remedial action costs at the Portland Harbor Superfund Site.[4]  *Id*, pp. 7-41.  The 2006 EPA Settlement Agreement was incorporated into this Consent Judgment.  *Id*, p. 10.

In February 2007, Wausau and Siltronic entered into an Agreement to Fund Settlement of State Claims ("Wausau State Claims Agreement") in order to fund Siltronic's share of a partial settlement of DEQ claims for past remedial action costs incurred in connection with the Portland Harbor Superfund Site.  *Id*, ¶ 29, Ex. F.  This Agreement notes the following:

> Siltronic and other potentially responsible parties have agreed to settle claims threatened by the DEQ which DEQ alleges arise from DEQ's allegation that Siltronic and others are liable for certain remedial action costs DEQ alleges it has incurred a the Portland Harbor Superfund Site, located in Portland, Oregon.  The terms of this settlement are set forth in a Consent Judgment entered into the record of the Circuit Court for the State of Oregon for the County of Multnomah ("Consent Judgment"), a copy of which is attached hereto and incorporated herein as Exhibit A.

*Id*, Ex. F, p. 2.

Pursuant to this Agreement, Siltronic asked Wausau to fund Siltronic's share of the payments due under the terms of the 2006 DEQ Consent Judgment, which amounted to $49,920.00.  *Id*.  Wausau agreed to pay Siltronic's share, noting that this payment was "intended to indemnify Siltronic for Siltronic's liability to DEQ for its past remedial action costs and interim remedial action costs, as defined by the Consent Judgment."  *Id*, p. 3.  The parties further agreed that the payment shall apply equally to each of the policies "and the amount of coverage limits remaining available under each Policy shall be reduced therefore."  *Id*.

In June 2008, Wausau and Siltronic entered into an Agreement to Fund Interim Participation in Natural Resource Injury Assessment ("Wausau Natural Resource Injury

---

[4] The submitted copy of the Consent Judgment does not show the date of filing.  Since each of the PRPs signed it in September or October 2006, presumably it was filed shortly thereafter.  Siltronic signed the Consent Judgment on September 18, 2006.  Complaint, Ex. F, p. 39.

Agreement") in order to fund Siltronic's share of the interim payment made to the National Resource Trustees under the terms of an Interim Funding and Participation Agreement. *Id*, ¶ 31, Ex. G. This Agreement notes the following:

> The Portland Harbor Natural Resource Trustee Council ("NRT") has subsequently declared that Siltronic is partially responsible under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 USC § 9601 et seq. ("CERCLA") for damages for injury to, destruction of, or loss of natural resources including the reasonable costs of assessing the same. As a result, NRT has, among other things, notified Siltronic of its intent to perform an Injury Assessment, utilizing a phased approach and has requested participation in, and funding of, the assessment of natural resource injuries by Siltronic and other potentially responsible parties[.]

*Id*, Ex. G, p. 2.

Pursuant to this Agreement, Siltronic asked Wausau to pay its share of the interim payment due to NRT, which amounted to $27,777.78. *Id*. Wausau agreed, noting that this payment was "intended to indemnify Siltronic for Siltronic's liability to NRT for a portion of the natural resource injury assessment costs under CERCLA Section 107." *Id*, p. 3. The parties further agreed that the payment shall apply equally to each of the policies "and the amount of coverage limits remaining available under each Policy shall be reduced therefore." *Id*.

In September 2009, EPA, NW Natural, and Siltronic entered into an Administrative Settlement Agreement and Order on Consent for Removal Action ("2009 EPA Settlement Agreement") with respect to an area known as the GASCO Sediments Site which is located within the Portland Harbor Superfund Site. Complaint, ¶ 23; Burr Decl., ¶ 5, Ex. 4. This Agreement requires that Siltronic and NW Natural perform "a response action investigation and design activities" and pay "response costs incurred by the United States and Tribal Governments" related to the GASCO Sediments Site. Burr Decl., Ex. 4, p. 3. The stated goal is to "lead ultimately to a final remedy" that "will be implemented under a consent decree

7 – OPINION AND ORDER

following EPA issuance of the ROD" (Record of Decision), but EPA reserved its right to order Siltronic "to perform response actions at the GASCO Sediment Site under CERCLA's order authorization either before or after a ROD is issued." *Id*, p. 21.

Sometime in September 2009, Wausau declared exhaustion of its coverage limits and refused to pay any additional defense costs. Complaint, ¶ 32; Burr Decl., ¶ 8. Although it has provided no accounting, Wausau contends that between 2003 and 2009, it not only paid the full $6 million in indemnity costs, but also paid $7,699,837.00 in defense costs, including payments to attorneys, environmental consultants, and others. Moore Decl., ¶ 7. Wausau made these payments at Siltronic's request. *Id*; Burr Decl., ¶ 7.

Upon Wausau's declaration of exhaustion, Granite State, Siltronic's umbrella liability insurance provider, accepted Siltronic's tender for coverage subject to an express reservation of its right to contest Wausau's exhaustion claim. Complaint, ¶ 33. At some point, Granite State concluded that its payment of Siltronic's defense and indemnity costs was premature since Wausau still had a continuing obligation to pay these costs. *Id*, ¶ 34; Burr Decl., ¶ 8. Siltronic again tendered payment of defense costs to Wausau, but Wausau rejected the tender and refused to pay any continuing defense costs. Complaint, ¶ 35; Burr Decl., ¶ 8. These costs continue to accrue. Complaint, ¶ 38.

On December 9, 2011, Siltronic filed this action for declaratory judgment and breach of contract against all of its insurers. Granite State and Wausau have filed cross claims against each other, and Wausau has also filed counterclaims against Siltronic. All parties seek a declaration of the various rights and responsibilities under the terms of the various insurance policies.

///

///

**STANDARDS**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

**DISCUSSION**

Siltronic seeks partial summary judgment on its First Claim for declaratory judgment against Wausau and asks the court to declare that Wausau has a continuing duty to defend Siltronic in connection with its cleanup responsibilities at the Portland Harbor Superfund Site. Wausau opposes summary judgment on the ground that by making $6 million in indemnity

9 – OPINION AND ORDER

payments on behalf of Siltronic between 2003 and 2009, the liability limits of the six policies are exhausted, thus terminating any continuing duty to defend Siltronic.

Once Wausau's duty to defend ends, Granite State is obligated to defend Siltronic under its umbrella insurance policies. Which insurer provides a defense may seem to be a relatively insignificant issue to Siltronic. However, Granite State takes the position that it has a single, combined indemnity/defense limit, such that every dollar spent on defense is one less dollar available for indemnity. Therefore, if Wausau has no continuing obligation to defend, then Siltronic faces the prospect at some point of paying its own defense costs, which could be substantial.

Resolution of this issue turns on how to interpret the policy provision which states that Wausau "shall not be obligated to pay any claim or judgment or to defend any suit *after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements*." Complaint, Ex. A, p. 89 (emphasis added). Siltronic takes the position that the phrase "judgments and settlements" is not ambiguous and that Wausau must continue to defend Siltronic in the ongoing proceedings with DEQ and EPA until those proceedings are finally resolved though "judgments and settlements." Given the large number of PRPs involved in the Portland Harbor Superfund Site, the parties predict that such a resolution may take years.

Siltronic concedes that it is legally obligated to pay cleanup costs and that between 2003 and 2009, it sought and received reimbursement of various cleanup costs from Wausau. Siltronic also acknowledges that if Wausau has indeed paid more than $6 million in indemnity costs, it need not continue to pay those costs. However, the duty to defend is distinct from the duty to indemnify and rests on whether Wausau's indemnity "liability has been exhausted by payment of judgments or settlements." Siltronic focuses its argument on general insurance contract

10 – OPINION AND ORDER

interpretation, asking the court to give effect to the plain language of the policy. Wausau does not appear to contend that the language at issue is ambiguous, instead arguing that Wausau's payment of environmental cleanup costs mandated by DEQ and EPA to date is the equivalent of the "payment of a judgments or settlements."

The parties do not dispute that Oregon law applies. In Oregon, the interpretation of an insurance policy is a question of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703, 706 (1992). When interpreting an insurance contract, the court's primary task is to "ascertain the intention of the parties" through analysis of the terms and conditions contained in the policy. *Id*; *Holloway v. Republic Indemn. Co. of Am.*, 341 Or 642, 649, 147 P3d 329, 333 (2006). If the policy itself does not define the term or phrase at issue, then the court must consider whether it has a plain meaning. *Holloway*, 341 Or at 650, 147 P3d at 333. If only one interpretation is plausible, then the court will apply that meaning and proceed no further. *Id*. If the term or phrase has more than one plausible interpretation, then the court will look to the "particular context in which that phrase is used in the policy and the broader context of the policy as a whole." *Id*, 341 Or at 650, 147 P3d at 334. If the phrase is still ambiguous, then "any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company." *Id*.

Because the phrase "exhausted by payment of judgments or settlements" is not defined by the policies, the court must look to its plain meaning. Though this phrase may seem straightforward at first glance, the fact cannot be overlooked that this is not an ordinary insurance coverage case, but instead involves an environmental action by DEQ and EPA. As summarized by another court:

> In the typical coverage case, a primary insurer validly exhausts its indemnity limits when it pays a settlement or judgment resolving third

11 – OPINION AND ORDER

> party claims . . . In an environmental action like this one where the insured is faced with an RAO (Remedial Action Order), however, there is no settlement or judgment in the usual sense of the words. For these reasons, it is difficult to ascertain precisely at which point indemnity limits may be validly exhausted.

*County of Santa Clara v. United States Fidelity & Guaranty Co.*, 868 F Supp 274, 277 (ND Cal 1994).

Consequently, in the context of an environmental action, the phrase "exhausted by payment of judgments or settlements" is ambiguous because it is subject to more than one reasonable interpretation. The court must therefore consider the context in which the term is used in the policy as well as the "broader context of the policy as a whole." *Holloway*, 341 Or at 650, 147 P3d at 334.

Oregon has recognized the difficulty that arises in interpreting insurance contracts involving environmental claims and has adopted rules of construction for resolving and interpreting coverage under these circumstances. In particular, for the purpose of compelling coverage in a general liability insurance policy, ORS 465.480 treats environmental claims as if they were lawsuits:

> Any action or agreement by the DEQ or the EPA against or with an insured in which the DEQ or the EPA in writing *directs, requests or agrees* that an insured take action with respect to contamination within the State of Oregon is equivalent to a suit or lawsuit as those terms as used in any general liability insurance policy.

ORS 465.480(2)(b) (emphasis added);[5] *see also Schnitzer Invest. Co., v. Certain Underwriters at Lloyds of London*, 197 Or App 147, 155-57, 103 P3d 1162,1167-69 (2005), *aff'd*, 341 Or 128, 137 P3d 1282 (2006); *St. Paul Fire & Marine Ins. Co., Inc. v. McCormick & Baxter Creosoting Co.*, 126 Or App 689, 700-02, 870 P2d 260, 266, *modified on reconsideration*, 128 Or App 234,

---

[5] This statute was adopted by the Oregon legislature in 1999, many years after the policies at issue were written.

12 – OPINION AND ORDER

875 P2d 537 (1994), *aff'd in part, rev'd in part on other grounds*, 324 Or 184, 923 P2d 1200 (1996).

The statute also provides that an insurer "may not be required to pay defense or indemnity costs in excess of the applicable policy limits[.]" ORS 465.480(3)(d). It creates a "rebuttable presumption" that "the costs of preliminary assessments, remedial investigations, risk assessments or other necessary investigation" are "defense costs" and that "the costs of removal actions or feasibility studies" are "indemnity costs and reduce the insurer's applicable limit of liability on the insurer's indemnity obligations." ORS 465.480(6)(a) & (b).

Between 2000 and 2009, the EPA and the DEQ issued at least three written orders (2000 DEQ Order, 2001 EPA Administrative Order, and 2004 DEQ Order) and entered into two agreements (2006 EPA Settlement Agreement and 2009 EPA Settlement Agreement) directing or requiring Siltronic to take various actions regarding contamination at the Property. Consequently, these DEQ and EPA actions are "equivalent to a suit or lawsuit" under ORS 465.480(2)(b).

The question then becomes whether Wausau's payment of $6 million over a period of six years to satisfy Siltronic's remediation obligations pursuant to those DEQ and EPA actions is equivalent to the "payment of judgments or settlements" for the purpose of exhausting the liability limits in Wausau's policies. Despite its undisputed legal obligation to pay those interim remediation costs, Siltronic argues that Wausau cannot terminate its defense obligation until all of the issues between Siltronic and all of the other PRPs involved in cleanup of the Portland Harbor Superfund site are resolved in a final Consent Decree.

Several environmental cases that are helpful to the analysis. In the most closely analogous case, the Washington Supreme Court held that the insurer's "payment of funds for

13 – OPINION AND ORDER

costs of complying with a consent decree is the functional equivalent of a settlement," thereby terminating that insurer's duty to defend. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wash 2d 654, 692, 15 P3d 115, 136 (2001). Washington law, as does Oregon law, provides for coverage when an insured cooperates with an environmental agency in the cleanup of hazardous waste even if no formal lawsuit has been filed. *Id*, 142 Wash 2d at 691, 15 P3d at 135. Although the court concluded that payment "for cleanup costs imposed via consent decrees . . . is the equivalent of exhaustion by settlement" under the policy, it denied summary judgment to the insurer due to a factual issue. Because "there is no complete accounting of the costs of these consent decrees," the court could not determine whether the insurer actually paid the full amount of the policy limit. *Id*.

A Texas district court came to a similar conclusion that cleanup costs constitute the payment of judgments or settlements, though there was no dispute about entry of a final judgment or settlement or whether the allocation of costs met the indemnity limit.

> [T]he court has already concluded that cleanup costs constitute property damage that depletes the policy limits. Thus, by paying $1 million of the cleanup costs, [the insurer] has used up the applicable limit of insurance in the payment of judgments or settlements . . . After [the insurer] exhausted the primary policy limits, it had neither the duty nor the right to defend [the insured].

*Mid-Continent Cas. Co. v. Eland*, No. Civ. 06-576-D, 2009 WL 3074618, at *9 (ND Tex Mar. 30, 2009).

Considering the slightly different question of whether an excess insurer had a duty to defend, another district court faced many of the same issues presented by this case. *Pacific Emp'rs Ins. Co. v. Servco Pacific Inc.*, 273 F Supp 2d 1149 (D Haw 2003). In an environmental pollution action, the plaintiff incurred at least $500,000.00 in remediation costs equal to the indemnity limit on the primary policy. The primary policy had identical language to Wausau's

14 – OPINION AND ORDER

policies at issue here, though the excess carrier's policy had different language to trigger its duty to defend. *Id* at 1153-54 (discussing the difference between the primary policy which provided exhaustion after "payments of judgment or settlements" and the excess insurer's duty to defend which arose when the primary insurer's obligation was "exhausted because of . . . property damage."). The primary insurer denied that it had an obligation to defend or indemnify the plaintiff, but nonetheless entered into a $1.5 million settlement to resolve all coverage questions. Because remediation and defense efforts were still ongoing at the time of the settlement, the insured looked to its excess insurer for further defense and indemnity coverage. The excess insurer declined to provide coverage, contending that the excess policy had not been triggered because the primary insurer did not exhaust its policy limits by paying a "judgment or settlement" of the underlying environmental claim. The court was "unconvinced" by this argument. It reasoned that if an excess carrier's duties were not triggered until the underlying claims were finally settled, "then the excess carrier's duty to defend would be illusory. Requiring the primary carrier first to litigate the underlying claim to judgment, or make the payments in settling the claim, would mean the excess carrier would then have nothing to defend[.]" *Id* at 1154.

The court ultimately concluded, following the reasoning of *Weyerhaeuser*, that the settlement exhausted the primary policy which triggered the excess insurer's duties. In reaching this conclusion, the court interpreted the language in the primary policy referring to "judgments or settlements" as stating "the commonsense proposition that if [the primary insurer] pays its limits by judgment or settlement – *i.e.*, if the underlying action is gone – then [the primary insurer's] duties have ended. It might also refer to settlements, like the [one here], with the insured." *Id* at 1154.

15 – OPINION AND ORDER

It also distinguished other cases which "are primarily concerned with 'premature' tendering of indemnity limits." "[T]he primary insurer cannot extinguish its defense obligation simply by tendering its indemnity limits to the insured and walking away from the fray – a tempting maneuver when it appears that defense costs will exceed indemnity limits." *Id* at 1155, quoting *County of Santa Clara*, 868 F Supp at 277. In contrast, the primary insurer's settlement was not such a "premature tender" since it occurred over three years after the insured originally tendered payment to the primary insurer and well after it had incurred the liability limit in remediation costs. Because "[n]othing indicates the settlement was collusive or not a result of a good faith compromise," the court concluded that it exhausted the primary policy's indemnity limits. *Id*.

The problem of "premature tender" or "dumping" is a significant concern in the context of environmental actions where defense costs may well exceed indemnity limits. Applying California law, a district court concluded that a primary insurer's payment of the policy limits to the insured before approval of a remediation plan did not "constitute a valid exhaustion of primary coverage" because "the payment must be made to satisfy an obligation arising out of either an adjudication or a compromise of a third party claim." *County of Santa Clara*, 868 F Supp at 278. The Remedial Action Order ("ROA") at issue only required the insured to investigate and develop a remediation plan for contamination at the site. Even though noncompliance with the RAO would result in stiff statutory penalties, the insured did not yet have any "liability to a third party" due to its right to appeal the RAO and refuse to comply based on various defenses. *Id* at 278. However, once an approved remediation plan was in place, it would become "the functional equivalent of a final adjudication of liability sufficient to exhaust primary indemnity limits and trigger [the insurer's] defense obligation." *Id* at 279. At that point,

16 – OPINION AND ORDER

the insurer "can tender its policy limits to the [insured] and thereby extinguish its duty to defend." *Id* at 280.

The common thread running throughout these cases is that an insurer may not exhaust its indemnity limits until a settlement or judgment of some kind imposes a legal obligation on the insured to a third party. In *Weyerhaeuser*, the insured incurred indemnity costs by complying with a consent decree. 142 Wash 2d at 690-91, 15 P3d at 134-35. In *Pacific Employers,* the insurer and the insured had entered into a settlement agreement to resolve the coverage issues. 273 F Supp2d at 1154. And in *County of Santa Clara*, indemnity costs would occur once the RAO's remediation plan was approved. 868 F Supp at 277.

Siltronic contends that merely paying the remediation costs required by the DEQ and EPA orders and agreements prior to entry of a final Consent Decree is not sufficient to amount to "exhaustion by payment of judgments or settlements." However, Siltronic overlooks the fact that these orders and agreements include language of finality and an intent to create legally enforceable rights and responsibilities to a third party. *See* Barber Decl., Ex. B, pp. 1-2, Complaint, Ex. F, pp. 3-4; Burr Decl., Ex. 4, p. 55.

At oral argument, Wausau represented that it made the majority of its indemnity payments in response to the 2004 Intent to Comply with DEQ, filed in response to the 2004 DEQ Order which required Siltronic to identify and implement source control measures for the cleanup of TCE and associated hazardous substances on the Property. Burr Decl., Ex. 3. Siltronic responded that the remediation performed in response to that Order was just a small piece of the ongoing cleanup efforts involving many other PRPs and that its final liability will not be known until a much later date. However, environmental actions often do not result in *final* judgments or settlements for decades because the cleanup is a long process involving many

17 – OPINION AND ORDER

parties making claims against one another. Siltronic's argument essentially boils down to asking the court to insert the word "final" before "judgments or settlements." While this is one plausible interpretation of the clause, it is not the most reasonable interpretation after taking into consideration the "particular context in which [the phrase] is used in the policy and the broader context of the policy as a whole." *Holloway*, 341 Or at 650, 147 P3d at 334. Consequently, by paying Siltronic's undisputed liability to third parties, Wausau has been paying indemnity costs in response to "judgments or settlements" as those terms are used in the policies.

As noted above, an insurer may not prematurely tender the policy limits in an attempt to avoid prolonged defense costs. Here, as in *Pacific Employers*, there is no evidence that Wausau's payment of the indemnity limits was anything other than in good faith. The underlying environmental action had been ongoing for nine years before Wausau declared exhaustion of the coverage limits. Additionally, and perhaps most importantly, Wausau accepted tender for coverage at the time that Siltronic gave notice of the environmental contamination actions against it. Within two months, it began paying the costs Siltronic incurred in response to DEQ's and EPA's various demands. It continued to pay those costs for six years and even entered into two agreements with Siltronic to pay a total of nearly $78,000.00 for Siltronic's share of various remediation costs as assessed by two different agreements, one with the DEQ (Wausau State Claims Agreement) and one with the NRT (Wausau Natural Resource Injury Agreement). Complaint, Ex. F, p. 2; Ex. G, p. 2. Consequently, nothing about this situation supports a conclusion that Wausau tendered the full amount of the indemnity liability in an attempt to avoid having to pay defense costs. In fact, by Wausau's calculations, it has spent even more in defense costs ($7,699,837.00) than in indemnity payments ($6 million). Thus, it has paid almost double the policy's liability limits. Accordingly, as long as Wausau has indeed paid

at least $6 million in indemnity payments at Siltronic's request, its "liability has been exhausted by the payment of judgments or settlements" and has no continuing duty to defend.

However, this does not necessarily end the analysis. Other than Wausau's own statement that it has paid the full indemnity amount and the statements in two Agreements attached to the Complaint as to amounts paid, there is no other accounting of its payments in the record. None of the documents submitted contain a complete accounting of the total indemnity costs paid by Wausau. The two Agreements that provide dollar figures total less than $78,000.00, which is a far cry from the $6 million liability limits.

For purposes of this motion, Siltronic does not contest Wausau's accounting of its indemnity payments. It alleges only that Granite State disagrees with Wausau's accounting, Complaint, ¶ 34; Barber Decl., Ex. A. At some point, it will be necessary to determine whether Wausau has actually paid $6 million for indemnity costs. However, the narrow legal issue presented by this motion is whether, assuming that Wausau has paid $6 million in indemnity costs, it had paid "judgments or settlements" as those terms are used in the policies. Based on the assumption that Wausau had paid $6 million in indemnity costs, this court concludes that Wausau has exhausted its indemnity liability by payment of "judgments or settlements" and has no continuing duty to defend Siltronic. Accordingly, Siltronic's motion seeking a declaration to the contrary is denied.

At oral argument, Wausau asked this court, in the event that it denied Siltronic's motion, to *sua sponte* grant summary judgment in its favor on Siltronic's claim for declaratory judgment. Such a declaration is within the court's power. *See Columbia River Rentals, LLC v. Phillips*, No. Civ. 08-395-HU, 2009 WL 632933, at *4 (D Or Jan. 14, 2009), citing *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F3d 487, 495 (9th Cir 2000); *Fordyce v. City of Seattle*, 55 F3d 436, 442 (9th Cir

1995).  Given that the purpose of this motion is to resolve Wausau's legal obligations with regard to its continuing duty to defend, it seems a reasonable and efficient course of action to grant summary judgment in Wausau's favor on this limited issue.

## **ORDER**

Siltronic's Motion for Partial Summary Judgment (docket #50) is DENIED, and Wausau is entitled to a declaration that, assuming it has paid $6 million in indemnity costs incurred by Siltronic pursuant to DEQ's and EPA's Orders and Agreements, it has exhausted its liability in the six policies at issue "by payment of judgments or settlements" and, thus, has no continuing duty to defend Siltronic.

DATED  February 4, 2013.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge
