UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SILTRONIC CORPORATION, a Delaware corporation,

        Plaintiff,

v.

EMPLOYERS INSURANCE COMPANY OF WAUSAU, a Wisconsin corporation; GRANITE STATE INSURANCE COMPANY, a Pennsylvania corporation; CENTURY INDEMNITY COMPANY, a Pennsylvania corporation; and FIREMAN'S FUND INSURANCE COMPANY, a California corporation,

        Defendants.

Case No. 3:11-cv-1493-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Siltronic Corporation ("Siltronic"), filed the underlying action for declaratory judgment and breach of contract in order to allocate financial responsibility for environmental claims pursuant to various insurance policies. The umbrella liability insurance provider, Granite State Insurance Company ("Granite State"), filed a cross-claim against the general commercial

1 – OPINION AND ORDER

liability provider, Employers Insurance Company of Wausau ("Wausau"), seeking declaratory judgment regarding its defense and indemnity obligations to Siltronic.

Wausau has ceased defending Siltronic on the basis that the limits of its policies have been exhausted. Granite State believes that Wausau has mischaracterized many of its payments, causing a premature exhaustion of its policies. Accordingly, Granite State now seeks summary judgment (docket #71) that certain payments made by Wausau of at least $357,568.04 (and arguably as much as $517,205.62) should be characterized as defense costs and not indemnity costs. For the reasons that follow, the motion is granted in part and denied in part.

## UNDISPUTED FACTS

Siltronic purchased six annual Commercial General Liability policies from Wausau for the years 1980 through 1986. Each of the six policies provides $1 million in indemnity liability, for a total of $6 million of coverage. These policies require Wausau to defend Siltronic until the $6 million indemnity limit is exhausted, which then triggers Granite State's obligations under its umbrella policies. On October 4, 2000, DEQ issued an Order ("2000 DEQ Order") requiring Siltronic to "perform a Remedial Investigation" approved by DEQ in order "to determine the nature and extent of releases of hazardous substances to Willamette River sediments" and "to develop and implement source control measures to address such releases, if necessary." Burr Decl., (docket #74-3), Ex. 1, pp. 1, 5. In order to comply, Siltronic hired the environmental consulting firm of Maul Foster and Alongi, Inc. ("Maul Foster"). In September 2003, Wausau began paying Siltronic's costs incurred in complying with the 2000 DEQ Order.

On February 5, 2004, DEQ issued another Order ("2004 DEQ Order") requiring Siltronic to perform a "remedial investigation of releases of trichloroethene (TCE) and its degradation byproducts . . . and to identify and implement, if necessary, source control measures for

unpermitted discharges or releases of TCE." *Id*, Ex. 3, p.1. The focus of work under the 2000 DEQ Order did not include TCE which was detected in July 2003 in the soil below the ground surface. *Id*, Ex. 3, p. 2.

On February 17, 2004, Siltronic responded to the 2004 DEQ Order with its Notice of Intent to Comply. Barber Decl. (docket #57), Ex. 2. Siltronic agreed to "perform such Remedial Investigation and Source Control Measures and additional measures as set forth [in the 2004 DEQ Order] or are otherwise required to identify, assess and implement source control measures, as appropriate, with respect to TCE and the hazardous substances associated with TCE as may be located on the Siltronic Property." *Id.*

On April 16, 2007, Maul Foster submitted a Remedial Investigation Report ("RI Report") in response to the 2004 DEQ Order which states: "With the exception of full implementation of source control measures, Siltronic has completed the scope of work in the [2004 DEQ] Order." Juncal Decl. (docket #115), ¶¶ 11-12. On October 29, 2007, Maul Foster submitted an Outfall Backfill Evaluation Report which concluded that "the pipe trench backfill is not a current or historical pathway for TCE." Peale Decl. (docket #75), Ex. 1, p. 1.

In June 2008, Siltronic and other potentially responsible parties ("PRP") under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 USC §9601 *et seq* ("CERCLA"), entered into an Interim Funding and Participation Agreement ("Interim FPA") with several government agencies and Native American tribes, collectively referred to as the Natural Resources Trustees ("NRT"), in order to implement an Injury Assessment Plan for natural resource damages to the site ("NRD Assessment"). Moore Decl. (docket #114), ¶ 13; Gladstone Decl. (docket #76), ¶ 3, Ex. 1. The PRPs agreed to fund the Interim FPA with no admission of liability or responsibility and to subsequently reallocate costs

3 – OPINION AND ORDER

between them based on ultimate liability.  Gladstone Decl., Ex. 1, p. 1.  Siltronic asked Wausau to pay its allocated share of the Interim FPA in the sum of $20,833.34.  Moore Decl., ¶ 13.  Wausau paid that sum to Siltronic pursuant to a written agreement which provides that "Wausau's payment of Siltronic's Share hereunder is intended to indemnify Siltronic for Siltronic's liability to NRT for a portion of the natural resource injury assessment costs under CERCLA Section 107."  *Id*, ¶ 13 & Ex. B, p. 3.

In September 2009, Wausau declared its coverage limits exhausted after paying $6,309,438.29 in indemnity costs and refused to pay any additional defense costs.  *Id*, ¶ 14.  Wausau calculated that it had also paid $7,699,837 in defense costs.  *Id*, ¶ 15.  In November 2009, Granite State accepted Siltronic's tender for coverage subject to an express reservation of its right to contest Wausau's exhaustion claim.  *Id*, ¶ 17.  At some point Granite State determined that Wausau had terminated coverage prematurely after mischaracterizing defense payments as indemnity payments.

On September 30, 2010, Maul Foster submitted its Stormwater Source Control Evaluation Report in response to the 2004 DEQ Order, concluding that "[c]hemicals in Siltronic's stormwater do not contribute significantly to contamination in sediment offshore" and that "[n]o additional source control is necessary."  Peale Decl., Ex. 2, pp. 14, 64.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989) (citation omitted). The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the non-moving party." *Bravo v. City of Santa Maria*, 665 F3d 1076, 1083 (9th Cir 2011) (citations omitted).

## DISCUSSION

**I.      Rebuttable Presumption**

Oregon law establishes the following rebuttable presumptions for categorizing environmental expenditures:

> (a) There is a rebuttable presumption that the costs of *preliminary assessments, remedial investigations, risk assessments or other necessary investigation*, as those terms are defined by rule by the Department of Environmental Quality, are *defense costs* payable by the insurer, subject to the provisions of the applicable general liability insurance policy or policies.
>
> (b) There is a rebuttable presumption that payment of the costs of *removal actions or feasibility studies*, as those terms are defined by rule by the Department of Environmental Quality, are *indemnity costs* and reduce the insurer's applicable limit of liability on the insurer's indemnity obligations, subject to the provisions of the applicable general liability insurance policy or policies.

ORS 465.480(7) (emphasis added).

A "remedial investigation" is a process undertaken to determine the nature and extent of contamination, including sampling, monitoring, and gathering data, to determine if remedial action might be necessary. Juncal Decl., ¶ 6; OAR 340-122-0080(1). It may include "characterization of hazardous substances, characterization of the facility, performance of baseline health and ecological risk assessments, and collection and evaluation of information relevant to the identification of hot spots of contamination." OAR 340-122-0080(2). If a remedial action is necessary, a "feasibility study" is then undertaken to "develop and evaluate a range of remedial action alternatives acceptable to [DEQ]." OAR 340-122-0085(2). A "remedial action" or "removal" is a type of clean-up that prevents or minimizes contamination at a site. ORS 465.200(23).

Wausau purports to have followed ORS 465.480(7) in categorizing its payments on Siltronic's behalf as either defense or indemnity costs. Granite State disagrees, contending that Wausau mischaracterized certain payments to Siltronic as defense costs, causing a premature exhaustion of its coverage limits. For purposes of this motion, Granite State has divided those disputed payments into the following six categories: (1) Backfill Evaluation ($34,047.92); (2) Stormwater Evaluation ($101,434.75); (3) Oregon Department of Environmental Quality ("DEQ") Oversight ($261,583.86 or $101,947.08); (4) Natural Resource Assessment ($20,833,34); (5) Remedial Investigation ($99,300.75); and (6) Unilateral Overpayment ($5.00).

## II.     **Backfill and Stormwater Evaluation**

First, Granite State seeks summary judgment that Maul Foster's work on the Outfall Backfill Evaluation Report ("Backfill Report") and the Stormwater Source Control Evaluation Report ("Stormwater Report") were defense costs because both reports constitute part of the remedial investigation effort. Pursuant to ORS 465.480(7)(a), "remedial investigations" are

...

presumed to be defense costs. Wausau responds that the reports evaluated source control measures and, therefore, qualify as "removal actions or feasibility studies" which are presumed to be indemnity costs pursuant to ORS 465.480(7)(b).

Maul Foster published the Backfill Report in October 2007 and the Stormwater Report in September 2010 in order to comply with the 2004 DEQ Order. The reports investigated potential TCE contamination in the bedding material surrounding the outfall pipe trenches, as well as in the stormwater drains and trenches. The Backfill Report concluded that "the pipe trench is not a current or historic pathway for TCE or its degradation products from the upland to the Willamette River." Peale Decl., Ex. 1, p. 4. The Stormwater Report similarly concluded that Siltronic's stormwaters "do not contribute significantly to contamination in sediment offshore of the site, nor . . . to risks in surface water and sediment in the Portland Harbor." *Id*, Ex. 2, p. 14.

Wausau's hydrogeologist, Russell W. Juncal, contends that the reports were part of Siltronic's remedial actions, and not investigatory efforts, because both were completed after the RI Report was published in April 2007, thus marking the conclusion of the remedial investigation required by the 2004 DEQ Order. Juncal Decl., ¶ 20. Wausau did not submit the RI Report or other evidence regarding the conclusion of Siltronic's investigatory duties, but contends that compliance activities occurring after April 2007 fell under a new rubric of "the Source Control Evaluation pursuant to Joint Source Control Strategy developed by the EPA and DEQ."

However, the record shows that remedial investigation continued after April 2007. In a letter dated August 23, 2006, Siltronic's attorney explained that based on the "preliminary results of the pilot study," DEQ was requiring Siltronic "to undertake *two further aspects* of the Source Control Evaluation pursuant to Joint Source Control Strategy developed by the EPA and DEQ."

*Id*, Ex. E, p. 1 (emphasis added). The "additional work" required was "evaluation of the backfill of the combined storm water/NPDES outfall pipe to conclusively document whether that backfill could be acting as a preferential flow pathway to the river; and an evaluation of the storm water pathway itself as a potential source of contamination of interest to the river." *Id*, Ex. E, pp. 1-2. That additional work culminated in the Stormwater and Backfill Reports.

In other words, DEQ had determined that additional remedial investigation was necessary pursuant to its 2004 DEQ Order even after publication of the RI Report. The RI Report had not considered potential contamination from backfill or stormwater-mediated transport. And while source control measures were being implemented for the sources of contamination identified in the RI Report through bioremediation and a pilot study, the existence of TCE contamination in stormwater and backfill was unknown when DEQ ordered Siltronic to complete the Stormwater and Backfill Reports.

As the reports clearly demonstrate, their purpose was to investigate the existence and source of TCE contamination. Under DEQ's definition, "remedial investigation" may include "characterization of hazardous substances, characterization of the facility, . . . and collection and evaluation of information relevant to the identification of hot spots of contamination." OAR 340-122-0080(2). The Stormwater Report states that its purpose is "to evaluate whether chemicals are impacting stormwater and migrating to the Willamette River at concentrations that may pose unacceptable risks to human health and the environment, and to identify contaminant sources requiring control, if any." Peale Decl., Ex. 2, p. 13. The "objective" of the Backfill Report was to "evaluate the potential for TCE and its degradation products to migrate along the pipe trench backfill, or along the upper surface of the silt unit underlying the backfill." *Id*, Ex. 1, p. 1.

8 – OPINION AND ORDER

Wausau asserts that the evaluative portion of the reports should be construed as "feasibility studies" for removal actions which are presumed to be indemnity costs. However, a "remedial investigation" specifically includes the "evaluation of information relevant to the identification of hot spots of contamination" and "[t]he transport and fate of the hazardous substances." OAR 340-122-0080(2) & (4)(f). Moreover, the purpose of the evaluations, as of the reports, was to determine whether either source, the backfill or the stormwater, was contributing TCE to the Willamette River.

Wausau also argues that the reports should be characterized as "feasibility studies" because they evaluated the efficacy of the existing source control measures for containing TCE, as evidenced by Maul Foster's labeling of the invoices as "Source Control." The 2004 DEQ Order stated that any necessary source control measures would be specific to TCE and its associated hazardous substances. While the Stormwater Report appears to review the ongoing best management practices under Siltronic's 2009 Stormwater Pollution Control Plan to limit contamination of stormwater, it did not evaluate the efficacy of best management practices for controlling TCE. Peale Decl., Ex. 2, pp. 13-14, 17, 42. Instead, the best management practices were actively containing arsenic, cadmium, copper, zinc, PCBs, and selected PAHs. *Id*, Ex. 2, p. 64. The report concluded that TCE was not among the contaminants expected to impact the stormwater and that "[n]o additional source control is necessary." *Id.* If the existing source control measures were deemed inadequate, then Siltronic would be required to take the next steps of conducting a feasibility study and implementing remedial action. However, based on Maul Foster's investigation (or source control evaluation) which culminated in the Backfill and Stormwater Reports, those next steps were not necessary. Thus, the work associated with both

reports constitutes "remedial investigations" and should be reclassified under ORS 465.480(7) as defense costs.

### III. DEQ Oversight

Granite State also seeks summary judgment to reclassify DEQ's charges to oversee Siltronic's compliance with the 2004 DEQ Order as defense costs. Granite State argues that all of DEQ's oversight charges, totaling $261,583.86, were defense costs. In the alternative, Granite State submits that, at a minimum, DEQ's costs to oversee Siltronic's remedial investigation and actions associated with removal or cleanup were defense costs, totaling $101,947.08.

According to Granite State, all charges by DEQ to provide oversight is a necessary, unavoidable expense for Siltronic to defend against the environmental claims brought by DEQ, similar to the expense of defending a lawsuit. In support, it cites *Fireman's Fund Ins. Co. v. Oregon Auto. Ins.*, CV 03-0025-MO, 2010 WL 1542552 (D Or Apr. 15, 2010), in which Judge Mosman treated DEQ's involvement in "investigating and approving proposed courses of action" as administrative costs, similar to "court costs incurred in defending litigation." *Id* at 6. On appeal, the Ninth Circuit affirmed this approach, but without analysis. *Fireman's Fund Ins. Co. v. N. Pac. Ins. Co.*, 446 F App'x 909 (9th Cir 2011) ("Although we are inclined to agree with Fireman's Fund on the bulk of the remaining issues presented to us in North Pacific's appeal, we refrain from issuing a non-binding advisory opinion to that effect."). Although Judge Mosman did not explain his reasoning, DEQ's oversight costs and court fees share the distinctive characteristic of unavoidability regardless of outcome. Both are mandatory expenses incurred early in the adjudication process before any apportionment of liability. Siltronic could have refused to pay DEQ's oversight fees, but only at the risk of being sued by DEQ and potentially being held liable for punitive damages for noncompliance. As warned by the 2004 DEQ Order,

10 – OPINION AND ORDER

"[p]ursuant to ORS Chapter 465, Respondent is liable for costs incurred by DEQ in issuing and overseeing implementation of this Order" and that "[u]pon Respondent's failure to comply with this Order, Respondent maybe be liable for any costs incurred by [DEQ] in conducting the work required under this Order and for punitive damages of up to three times the amount of [DEQ's] costs." Burr Decl., Ex. 3, p. 9; ORS 465.260(6).

Similarly, other federal courts have characterized payment of federal agency oversight fees as a preventative defense expense because it creates an opportunity to mitigate liability. CERCLA permits the participation of a PRP in creating the administrative record that ultimately determines the fact and proportional share of a PRP's liability at a contamination site. Under its oversight, the EPA may allow a PRP to conduct the remedial investigation and feasibility to determine the best course for remediation. 42 USC § 9604(a)(1). In other words, the PRP may participate, but only if it agrees to reimburse the government for any oversight costs. CERCLA's oversight costs have been described as "defense costs as they are expended to develop and put forth a theory that the defendant is not liable for contamination." *Hi-Mill Mfg. Co. v. Aetna Cas. & Sur. Co.*, 884 F Supp 1109, 1117 (ED Mich 1995) (internal quotation omitted). The purpose of CERCLA oversight fees explains why paying the fees is such an attractive defense strategy.

> The entire CERCLA scheme revolves around "encouraging" PRPs to engage in voluntary cleanups. Only in so doing may a PRP have a voice in developing the record that will be used against it and in determining the amount of its liability through selection of investigatory and remedial methods and procedures.

*Id.*

11 – OPINION AND ORDER

On the other hand, Wausau argues that DEQ's oversight charges should be deemed indemnity costs because they were incurred by DEQ, an adverse party, to prosecute its case for environmental contamination against Siltronic. Like CERLA, Oregon's Environmental Cleanup Assistance Act, ORS 465.475-465.480 ("ECAA"), is a strict liability statute. The 2004 DEQ Order states that "[a]s owner and operator of a facility, [Siltronic] is strictly liable under ORS 465.255, and therefore may be required by DEQ to conduct any removal or remedial action necessary." Peale Decl., Ex. 3, p. 3. But unlike § 9604 of CERCLA, the 2004 DEQ Order requires Siltronic to perform "a remedial investigation of releases of trichloroethene (TCE) and . . . implement[ation], if necessary, of source control measures" as approved by DEQ. In other words, DEQ could create additional work for Siltronic as it deems necessary. In fact, acting on that authority, DEQ required Siltronic to complete the Backfill and Stormwater Reports even after Maul Foster declared the remedial investigation to be complete. As a result, DEQ's mandatory involvement increased Siltronic's liability through additional compliance actions and greater environmental consultant fees. From that standpoint, the strategic incentives described in *Hi-Mill* were not necessarily a driving factor in Siltronic's decision to comply.

Acknowledging the lack of controlling authority, Granite State proposes a more conservative and functional alternative of dividing DEQ's oversight costs into defense and indemnity costs according to the substance of the compliance work overseen, as other district courts outside the Ninth Circuit have done. *See, e.g.*, *Endicott Johnson Corp. v. Liberty Mut. Ins. Co.*, 928 F Supp 176 (NDNY 1996); *Higgins Indus., Inc. v. Fireman's Fund Ins. Co.*, 730 F Supp 774 (ED Mich 1989). As explained in *Endicott*, this outcome as applied to CERCLA oversight fulfills the fair expectations of the parties:

> Policyholders and insurance companies generally expect that a careful investigation of the insured's potential liability will be

12 – OPINION AND ORDER

> provided by the insurer pursuant to its duty to defend. However, it is unlikely that a policyholder could fairly expect that an insurance company would bear limitless liability to perform feasibility studies, especially when those studies begin the process of mandated environmental cleanup.

*Endicott*, 928 F Supp at 184.

Most importantly, characterizing all DEQ oversight costs as either indemnity or defense costs runs contrary to the presumptions set forth in ORS 465.480(7). To date, a portion of DEQ's oversight has included the selection of remediation alternatives through feasibility studies and the implementation of an enhanced *in-situ* bioremediation system to address TCE. Peale Decl., ¶ 5. That work is presumed to be indemnity costs. The remainder of DEQ's oversight involved remedial investigation expenses that are presumed to be defense costs. The approach articulated in *Endicott* is consistent with Oregon's statutory presumptions. Therefore, the court adopts *Endicott* approach for delineating whether DEQ oversight constitutes indemnity or defense.

> To the extent that an expense is primarily attributable to remedial investigations—which address the sources and extent of the contamination, whether environmental damage can be mitigated by controlling the sources, or whether additional action is necessary because of migration of contaminants from the site—the expense will be treated as a defense cost. To the extent an expense is primarily attributable to feasibility studies—which comprise plans for selecting and implementing the remediation alternative for the site—the expense will be treated as damages to be indemnified. Finally, to the extent the Court cannot determine based on written submissions whether an expense is attributable to either RI or FS, the Court will have broad discretion to allocate the expense in an equitable manner.

*Endicott*, 928 F Supp at 184.

However, the parties dispute the appropriate allocation under this approach. Granite State's hydrogeologist, James G. D. Peale, states that "the only removal actions or feasibility

13 – OPINION AND ORDER

studies conducted for the Site related to the implementation of an enhanced *in-situ* bioremediation ("EIB") system to address TCE" and that DEQ "first began evaluating feasibility studies for the EIB in February 2006." Peale Decl., ¶ 5. As a result, Granite State contends that none of DEQ's oversight costs prior to February 2006 are indemnity costs.

Wausau's hydrogeologist, Mr. Juncal, disagrees and describes Mr. Peale's statement as "factually incorrect." Juncal Decl., ¶ 14. Based on various notes at a November 2005 meeting and on work performed from June to December 2005 which was billed as "Feasibility Study," he concludes that "Siltronic was evaluating the feasibility of remedial technologies and ODEQ was overseeing feasibility study work at least 3 to 8 months earlier than state by Mr. Peale." *Id.* He also states that the technology feasibility evaluation "included remedial approaches other than [EIB]." *Id*, ¶ 15. In addition, Mr. Juncal disagrees with the analysis of DEQ invoices by Granite State's consultant, Daniel Sullivan, and "found substantial errors in his characterization methodology." *Id*, ¶¶ 23-24. Based on the current record, this court cannot resolve this dispute between the parties' experts.

Moreover, Granite State argued at the hearing that 26 of the DEQ oversight invoices are not disputed by Wausau. Neither party appears to address this category of invoices in their submissions, and this court cannot determine from the experts' charts which invoices may be undisputed. Although DEQ's oversight charges should be allocated between defense and indemnity costs pursuant to ORS 465.480(7) based on the substance of the compliance work overseen, a factual dispute exists as to the proper allocation. Accordingly, Granite State is not entitled to summary judgment as to DEQ oversight charges.

///

///

IV.     **Natural Resource Assessment**

Granite State also challenges Siltronic's contribution to the Interim FPA as an indemnity cost. Although Wausau and Siltronic agreed to characterize this payment as an indemnity cost, Granite State argues that it is a defense cost because there has yet to be an allocation of liability or a requirement that Siltronic pay for natural resource damage. However, the Interim FPA clearly states that the payment made by Siltronic was to resolve a claim against Siltronic for causing damage to natural resources. The amount of that claim was not yet known, but nonetheless existed and required the funding of the NRD Assessment. Paying an insured's adversary for the costs of assessing and perfecting a claim against the insured is part of the insurer's liability, not a defense cost.

Granite State also notes that it was not a party to and, thus, not bound by the agreement between Wausau and Siltronic, citing authority that an insurer's right to equitable contribution is independent of the rights of the insured. That Granite State was not a party to that agreement misses the point. The payment to the NRT was intended to partially resolve the claims asserted against Siltronic for natural resource damage. Based on the presumption set forth in ORS 465.480(7), Wausau's payment for Siltronic's share of the Interim FPA is properly categorized as an indemnity cost.

V.      **Remedial Investigation**

Granite State also seeks to reclassify invoices 8547, 9658, and 11661 (totaling $99,300.75) as defense costs because Maul Foster coded these invoices as "Remedial Investigation." Wausau concedes that it made an administrative mistake in classifying invoices 8547 and 9658 (totaling $63,304.42) as indemnity costs. Moore Decl., ¶ 19 & Ex. C. However, Wausau points out that it made another error by improperly coding and paying invoices 8548 and

15 – OPINION AND ORDER

9660 for source control activities (totaling $28,871.01) as defense costs that should have been paid as indemnity costs. *Id*. By offsetting one error against the other, only $34,433.41 ($63,304.42 - $28,871.01) of invoices 8547 and 9658 were erroneously classified as indemnity costs. Since the errors are not disputed, Granite State is granted summary judgment to reclassify $34,433.41 of invoices 8547 and 9658 as defense costs.

Invoice 11661 ($50,180.53) contains a series of data management tasks in June 2008 pertaining to groundwater monitoring. Peale Decl., Ex. 23, pp. 3-4. Although Maul Foster labeled the invoice as "Remedial Investigation," it is not at all clear whether it relates, at least in part, to remediation or removal actions. According to the chart prepared by Mr. Juncal, part of the work billed under invoice 11661 involved "[m]onitoring and pro rata share of project management and for pilot test/compliance monitoring not remedial investigation." Juncal Decl., ¶ 25 & Ex. 3, p. 3. As far as this court can discern, the only remedial investigation for groundwater continuing after the issuance of the RI Report in April 2007 involved stormwater-mediated transport. Because all the work billed under invoice 11661 occurred after April 2007 and involved groundwater, part of it may involve remediation and removal efforts. At this point, the court lacks sufficient information to determine how much, if any, of invoice 11661 should be classified as defense costs.

In reviewing Maul Foster's invoice, Mr. Juncal has discovered additional invoices totaling $46,274.31 that he claims were billed as remedial investigation costs and paid as defense costs, but include charges for activities involving source control and pilot test work which constitute removal actions and feasibility studies. *Id*, ¶ 26. Wausau seeks an opportunity to recharacterize these payments. However, it has not yet placed these payments at issue by filing the appropriate motion.

16 – OPINION AND ORDER

**VI.    Unilateral Overpayment**

Finally, Granite State seeks to reclassify a $5.00 overpayment by Siltronic to Maul Foster under invoice 9308 as defense costs. Wausau does not address this alleged overpayment, but its expert appears to agree with Granite State. Juncal Decl., Ex. C, p. 2. Thus, Granite State is entitled to summary judgment for this overpayment.

## ORDER

For the reasons stated, Granite State's Motion for Partial Summary Judgment (docket #71) is GRANTED in part and DENIED in part as follows:  The following expenses paid by Wausau as indemnity costs should be reclassified under ORS 465.480(7) as defense costs: (1) Backfill Evaluation ($34,047.92); (2) Stormwater Evaluation ($101,434.75); (3) DEQ Oversight of remedial investigations, but a factual dispute exists as to amount; (4) Remedial Investigation as to $34,433.41 of invoices 8547 and 9658, but a factual dispute exists as to invoice 11661; and (5) Unilateral Overpayment ($5.00).

DATED March 7, 2014.

s/ Janice M. Stewart<br>
Janice M. Stewart<br>
United States Magistrate Judge