UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SILTRONIC CORPORATION, a Delaware corporation

        Plaintiff,

v.

EMPLOYERS INSURANCE COMPANY OF WAUSAU, a Wisconsin corporation; GRANITE STATE INSURANCE COMPANY, a Pennsylvania corporation; CENTURY INDEMNITY COMPANY, a Pennsylvania corporation; and FIREMAN'S FUND INSURANCE COMPANY, a California corporation,

        Defendants.

Case No. 3:11-cv-1493-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

### INTRODUCTION

Plaintiff, Siltronic Corporation ("Siltronic"), filed the underlying action for declaratory judgment and breach of contract in order to allocate financial responsibility for environmental claims arising out of the Portland Harbor Superfund Site pursuant to various insurance policies. Between 1978 and 1986, defendant, Employers Insurance Company of Wausau ("Wausau"), issued seven annual Comprehensive General Liability Policies to Siltronic. Complaint, ¶ 9.

1 – OPINION AND ORDER

Wausau defended Siltronic on various environmental claims until 2009 when it concluded that the $6 million indemnity limits of the six policies covering the time period from 1980-86 were exhausted.[1] Cross-claimant, Granite State Insurance Company ("Granite State"), Siltronic's umbrella insurer, then began to pay Siltronic's defense costs.

Siltronic has now filed a Second Motion for Partial Summary Judgment (docket #141) on the limited issue of whether Wausau has a continuing duty to defend Siltronic under its first policy ("1978-79 Policy") and must reimburse Siltronic for unpaid defense costs. Granite State joins the motion, but disputes the amount of indemnity costs already paid by Wausau as represented by Siltronic (docket #147). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons stated, the motions are GRANTED in part and DENIED in part.

## BACKGROUND

In 1978, Siltronic bought real property located at 7200 NW Front Avenue ("Property") on the southwest shore of the Willamette River in a "heavy industrial" area. McCue Decl. (docket #145), ¶ 8.

Northwest Natural Gas Company ("NW Natural") owns real property adjacent to the Property. *Id*, ¶ 9. The Property and adjacent NW Natural property were once owned as a single parcel by NW Natural's predecessor, the Portland Gas and Coke Company ("GASCO"), on which it operated an oil gasification plant. *Id*; Burr Decl. (docket #146), Ex. 1, p. 2. GASCO disposed of the waste generated at the plant, Manufactured Gas Product ("MGP"), in tar ponds now located on the Property from 1940-41 until 1956 when the MGP operations ceased. Burr Decl., Ex. 1, p. 2. This disposal area became known as the "GASCO Sediment Site." *Id*, Ex. 4,

---

[1] The parties continue to dispute whether the indemnity coverage of the six policies for the years 1980-86, totaling $6 million, is exhausted.

p. 8. Before Siltronic purchased the Property, the MGP waste was covered up with fill materials, including material from the Willamette River. McCue Decl., ¶ 9. Siltronic first learned of these MGP disposal activities and the placement of cover-up fill materials several years after it purchased the Property. *Id.*

In February 1979, Siltronic began construction of an outfall pipe for treated effluent from the wastewater treatment pipe on the Property to the river. *Id*, ¶ 11(a)-(b). The construction required excavation and removal of fill material and a limited amount of submerged sediment along the northeast border of the Property. *Id.* On May 18, 1979, the excavation and pile driving activities disturbed oily sediment containing the buried MGP, and Siltronic set up an oil boom in the river to contain surfacing oil. *Id*, ¶ 11(c)-(d) & Exs. 5-9. Siltronic deposited the dredge material containing the oil on the riverbank away from the river. *Id*, ¶ 11(d) & Ex. 11. Although a dredged material disposal agreement between Siltronic's predecessor, Wacker Siltronic, and the Port of Portland designated Swan Island for disposal of dredging spoil materials, the dredge material remained on the Property. *Id*, ¶ 11(f)-(g) & Ex. 10.

In March 1980, Siltronic began manufacturing silicone wafers on the Property, generating trichloroethene ("TCE") waste. Gorman Decl. (docket #142), Ex. 1, p. 3.

On October 4, 2000, DEQ issued an Order ("2000 DEQ Order") requiring Siltronic and NW Natural to "perform a Remedial Investigation" of the Property "to determine the nature and extent of releases of hazardous substances to Willamette River sediments" and "to develop and implement source control measures to address such releases, if necessary." Burr Decl., Ex. 1, p. 5. The 2000 DEQ Order included the following findings of fact specifically identifying MGP as one of the "hazardous substances:"

> The former GASCO plant produced oil gas and lampblack briquettes. Waste generated at the plant included tar, spent oxide, and

3 – OPINION AND ORDER

> wastewater containing dissolved and suspended hydrocarbons. . . .
> Subsurface petroleum or tar has been encountered before and during
> various construction activities on the [Siltronic] Property after [Siltronic's]
> acquisition of the property.

*Id*, p. 2.

The 2000 DEQ Order also identified NW Natural and Siltronic "[a]s current or past owner or operator of a facility," each of whom is "strictly and jointly and severally liable under ORS 465.255, and therefore may be required by DEQ to conduct any removal or remedial action necessary to protect public health, safety, and welfare and the environment, pursuant to ORS 465.260(4)." *Id*, p. 4.

On December 8, 2000, the EPA issued a Notice of Potential Liability ("2000 EPA Notice") which deemed Siltronic a potentially responsible party ("PRP") for sediment contamination then alleged to exist in a designated section of the Willamette River. *Id*, Ex. 2, p. 2. It also stated that Siltronic might "be ordered to perform response actions deemed necessary by EPA [or] DEQ" and "to pay for damages to, destruction of, or loss of natural resources, including the costs of assessing such damages." *Id*, p. 1.

On June 23, 2003, Siltronic notified Wausau of the EPA and DEQ actions against it. Gorman Decl., Ex. 1. Wausau, though its administrator, Nationwide Indemnity Company, agreed to pay Siltronic's defense costs subject to a reservation of rights. *Id*, Ex. 2, p. 4; Burr Decl., Ex. 6, p. 1. Beginning on or about September 2003, Wausau began paying Siltronic's costs incurred in response to the EPA and DEQ demands. Complaint, ¶ 29; Moore Decl. (docket #150), ¶ 4.

On February 5, 2004, DEQ issued an Order ("2004 DEQ Order") requiring Siltronic to perform additional remedial investigations and conduct additional source control measures specifically targeting discovery of releases of TCE. Burr Decl., Ex. 3.

4 – OPINION AND ORDER

In early September 2009, EPA, NW Natural, Siltronic, and other parties entered into an Administrative Settlement Agreement and Order on Consent for Removal Action ("2009 Settlement Agreement"). *Id*, Ex. 4. This Agreement made Siltronic and NW Natural "liable for performance of response action and for response costs incurred and to be incurred" related to the GASCO Sediments Site. *Id*, p. 18. At the same time, Siltronic and NW Natural entered a Participation and Interim Cost Sharing Agreement ("Cost Sharing Agreement") to jointly conduct the remedial design activities in order to comply with the 2009 Settlement Agreement and allocate the associated costs. Moore Decl., Ex. B, p. 1.

Also in September 2009, Wausau declared exhaustion of the coverage limits under the six policies issued from 1980-86 and refused to pay any additional defense costs. *Id*, ¶ 9. Wausau contends that between 2003 and 2009, it not only paid the full $6 million in indemnity costs under those six policies, but also paid $7,699,837.00 in defense costs, including payments to attorneys, environmental consultants, and others. *Id*, ¶ 10.

## POLICY PROVISIONS

In 1978, Wausau issued the 1978-79 Policy for the period of August 17, 1978, through January 1, 1980. Complaint, Ex. A, p. 6. The provision at issue is contained in each of the seven policies and provides that Wausau will pay:

> all sums which the insured shall become legally obligated to pay as damages because of . . . **property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

*Id*, p. 7 (emphasis added).

5 – OPINION AND ORDER

The 1978-79 Policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected not intended from the standpoint of the insured." *Id*, p. 3. "Property damage" is defined as

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

*Id.*

The 1978-79 Policy provides $1 million in indemnity liability and requires Wausau to defend Siltronic until the $1 million indemnity limit is exhausted. *Id*, p. 11.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989) (citation omitted). The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).

The 1978-79 Policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected not intended from the standpoint of the insured." *Id*, p. 3. "Property damage" is defined as

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

*Id.*

The 1978-79 Policy provides $1 million in indemnity liability and requires Wausau to defend Siltronic until the $1 million indemnity limit is exhausted. *Id*, p. 11.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989) (citation omitted). The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).

The court must view the inferences drawn from the facts "in the light most favorable to the non-moving party." *Bravo v. City of Santa Maria*, 665 F3d 1076, 1083 (9th Cir 2011) (citations omitted).

## DISCUSSION

The environmental claims against Siltronic involve two contaminants, MGP and TCE. Siltronic did not begin to use TCE at the Property until March 1980, after expiration of the 1978-79 Policy. Wausau paid Siltronic's defense costs for TCE contamination under its 1980-86 policies until 2009 when it concluded that the indemnity limits of those polices were exhausted.

Siltronic and Granite State contend that Wausau had, and continues to have, a duty to defend Siltronic in connection with its cleanup responsibilities for MGP contamination under the 1978-79 Policy. Therefore, Siltronic seeks coverage of defense costs under the 1978-79 Policy until it $1 million indemnity limit is exhausted. Siltronic contends that this duty to defend under the 1978-79 Policy was triggered due to: (1) contamination of the Property with legacy MGP waste, causing continuous damage and uncontrolled migration; and (2) when it redistributed MGP while constructing an outfall pipe in 1979.

## I.    Legal Standard

In this diversity action, Oregon law governs the construction of the Policy. *Larson Constr. co. v. Oregon Auto. Ins. Co.*, 450 F2d 1193, 1195 (9th Cir 1971) (citation omitted). Under Oregon law, "[a]n insurer has a duty to defend if the claimant can recover against the insured under the allegations of the complaint on any basis for which the policy affords coverage." *Falkenstein's Meat Co. v. Md. Cas. Co.*, 91 Or App 276, 279, 754 P2d 621, 623 (1988) (citation omitted). The duty to defend "is determined by comparing the terms of the

insurance policy with the allegations of the complaint against the insured." *Drake v. Mut. of Enumclaw Ins., Co.*, 167 Or App 475, 478, 1 P3d 1065, 1068 (2000).

> Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy. Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured.

*Ledford v. Gutoski*, 319 Or 397, 400, 877 P2d 80, 83 (1994) (*en banc*) (citation omitted).

Conversely, "[i]f the complaint does not contain allegations of covered conduct . . . , then the insurer has no duty to defend." *Abrams v. Gen. Star Indem. Co.*, 335 Or 392, 400, 67 P3d 931, 935 (2003).

## II.    Duty to Defend

### A.    "Suit"

Siltronic claims that it has incurred unpaid defense expenses in excess of $1.6 million associated with the 2000 DEQ Order, 2000 EPA Notice, 2004 DEQ Order, and the 2009 Agreement. Barber Decl. (docket #149), Ex. A, pp. 3, 5 (Answers to Interrogatories Nos. 27 & 31). The parties do not dispute that the various EPA and DEQ actions finding Siltronic a potentially responsible party are the equivalent of "suits" under the 1978-79 Policy. For the purpose of compelling coverage in a general liability insurance policy, ORS 465.480 treats environmental claims as if they were lawsuits:

> Any action or agreement by the [DEQ] or the [EPA] against or with an insured in which the [DEQ] or the [EPA] in writing *directs, requests or agrees* that an insured take action with respect to contamination within the State of Oregon is equivalent to a suit or lawsuit as those terms as used in any general liability insurance policy.

8 – OPINION AND ORDER

ORS 465.480(2)(b) (emphasis added); *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 126 Or App 689, 701, 870 F2d 260, 266 (1994) (administrative order to cleanup is suit).

Instead, the parties dispute whether, as a result of these "suits," Siltronic was liable for property damage resulting from MGP contamination during the policy period.

### B. "Property Damage" Caused by "Occurrence"

The 1978-79 Policy covers only third-party property damage that occurred during the policy period. Complaint, Ex. A., p. 3. Siltronic contends that property damage occurred in 1979 as a result of the legacy MGP contamination by NW Natural and also by the release of MGP during its own excavation in 1979.

Wausau does not contest that the legacy MGP contamination by NW Natural caused third-party property damage in 1979, rendering Siltronic, as the owner, potentially liable for remediation of that contamination. However, it argues that it had, and still has, no duty to defend Siltronic under the 1978-79 Policy because: (1) Siltronic only tendered defense to Wausau of the TCE contamination; and (2) Siltronic has incurred no defense costs associated with the MGP contamination.

Wausau's first argument is easily rejected. Wausau argues that it has no duty to defend Siltronic for any MGP contamination that occurred prior to the production of TCE on the Property in 1980 because Siltronic only tendered coverage for liability stemming from the TCE contamination. Wausau points to Siltronic's three-year delay in notifying Wausau about the claims as confirming that it was only seeking a defense for claims involving TCE contamination.[2] However, in its letter dated June 23, 2003, Siltronic tendered to Wausau all

---

[2] Late notice may bar coverage if an insurer can prove that it has suffered prejudice. *See Port Servs. Co. v. Gen. Ins. Co. of Am.*, 838 F Supp 1402, 1405 (D Or 1992) (a three-month delay in giving notice was prejudicial and

9 – OPINION AND ORDER

"claims for defense and indemnity arising from claims and losses [it] has and will sustain investigating and remediating hazardous wastes contaminating soil and groundwater at" the Property under all of its policies covering the period from 1978 through 1986. Gorman Decl., Ex. 1, pp. 1-2. This letter was not limited as to any particular type of hazardous waste. Siltronic attached the 2000 DEQ Order and noted the specific findings of fact referencing MGP contamination on the Property. *Id*, p. 4. The letter also explained that Siltronic:

> has denied many of DEQ's findings and conclusions and; until recently, has demanded that [NW Natural] conduct the work required by the DEQ Order subject to an access agreement that has been negotiated between the parties for that purpose. [NW Natural] has complied to date. However, the recent discovery of chlorinated solvents [TCE] in groundwater below the Property and concerns expressed by DEQ and EPA about the significance of this contamination to the environmental condition of the Portland Harbor and groundwaters of the State have caused [Siltronic] to take a much more active role in the remedial investigation. As a result, [Siltronic] has spent and expects to spend considerable sums of money to comply with DEQ's Order.

*Id*, p. 5.

Admittedly, the discovery of the TCE contamination prompted Siltronic to tender the claims to Wausau nearly three years after Siltronic received the 2000 DEQ Order. In addition, Wausau's duty to defend when receiving Siltronic's tender may only be premised on facts alleged in the "suits" tendered to it by Siltronic. *Ferguson v. Birmingham First Ins. Co.*, 254 Or 496, 505-06, 460 P2d 342, 346 (1969) (*en banc*) ("The insurer's knowledge of facts not alleged in the complaint is irrelevant in determining the existence of the duty to defend and consequently the insurer need not speculate as to what the 'actual facts' of the alleged occurrence may be.").

---

barred coverage); *Carl v. Or. Auto. Ins. Co.*, 141 Or App 515, 525, 918 P2d 861, 866 (1996) (a one-year delay in giving notice was prejudicial and barred coverage). Despite Siltronic's three-year delay in providing notice, Wausau does not assert late notice as a complete bar to Siltronic's claim.
.

10 – OPINION AND ORDER

However, Siltronic clearly gave notice of and tendered its claims for defense and indemnity to Wausau arising from the claims in the 2000 DEQ Order and 2000 EPA Notice. The attached 2000 DEQ Order did not state when the "occurrence" happened in 1979. However, it did find that Siltronic acquired the Property in 1978 (Burr Decl., Ex. A, ¶ 2(B)), that the former GASCO plan discharged hazardous substances, including MGP, into ponds located on the Property beginning in 1941 (*id*, ¶ 2(D)), that "[s]ubsurface petroleum or tar has been encountered before and during various construction activities on the [Siltronic] Property after [Siltronic's] acquisition of the property" (*id*, ¶ 2(E)), and that Siltronic, as the current owner, is required to remediate all contamination on the Property. *Id*, ¶ 3(E). Thus, Wausau was notified of legacy MGP contamination since 1941 and continuing through 2000, which includes the 1978-79 Policy period. Thus, contrary to Wausau's position, Siltronic's tender included all past, present, and future costs to comply with the 2000 DEQ Order, including removal or remedial action relating to legacy MGP contamination. Whether coverage was also triggered by Siltronic's construction activities in 1979, which is in dispute, need not be determined at this juncture.

Nonetheless, Wausau asserts that it had, and continues to have, no duty to defend under the 1978-79 Policy because Siltronic has incurred no defense costs relating to MGP contamination. Instead, NW Natural assumed full liability for its legacy MGP contamination and agreed to pay all associated remediation costs. As explained by Nationwide's Specialty Consultant:

> I understood that Siltronic was not incurring costs to respond to legacy MGP contamination because [NW Natural] had accepted responsibility for addressing those claims. I monitored the invoices submitted by Siltronic's attorneys and environmental consultants to confirm that they were not billing for work to address legacy MGP contamination. I specifically requested that Siltronic identify any costs incurred to address legacy MGP contamination, as I would seek recovery of funds from responsible

11 – OPINION AND ORDER

> party [NW Natural]. Siltronic informed me that its involvement in the response to MGP claims was limited to situations where MGP waste has become commingled with TCE waste generated by Siltronic's manufacturing operations at the site, which began in March 1980. . . .
>
> Based on Siltronic's representations that it was not paying any costs associated with legacy MGP contamination, I concluded that there was no coverage under the Wausau policy issued for the period from August 17, 1978 to January 1, 1980, because Siltronic had not conducted any operations at the site involving TCE until March 1980.

Moore Decl., ¶¶ 6-7.

Wausau does acknowledge that it may have a future duty to defend Siltronic under the 1978-79 Policy if and when NW Natural or any other party makes a claim against Siltronic for contribution for any remediation costs attributable to the MGP contamination.

The problem with Wausau's argument is that it confuses the duty to defend with a breach of that duty. Under Oregon law, the duty to defend "is determined by comparing the terms of the insurance policy and the facts alleged in the complaint against the insured." *Drake*, 167 Or App at 478, 1 P3d at 1068. A determination of liability is not needed to trigger a duty to defend. By comparing the terms of the 1978-79 Policy and the 2000 DEQ Order (the equivalent of "the complaint against the insured"), Wausau clearly had a duty to defend Siltronic for claims arising from MGP contamination. Under the 2000 DEQ Order, Siltronic is "strictly and jointly and severally liable under ORS 465.255, and therefore may be required by DEQ to conduct any removal or remedial action necessary." Burr Decl., Ex. 1, p. 4. That action related to releases of "hazardous substances to Willamette River sediments" which included MGP generated at the former GASCO plant and discharged into the Willamette River and tar ponds now located on the Property. *Id*, ¶¶ 1, 2(D). Thus, the 2000 DEQ Order alleges potential liability of Siltronic for "property damage" caused by an "occurrence" within the 1978-79 Policy coverage period.

12 – OPINION AND ORDER

As Wausau points out, NW Natural acknowledged its role as the operator of the former GASCO plant and prior owner of the Property and, thus, agreed to pay for MGP remedial investigation. As confirmed by a November 10, 2000 letter to DEQ, NW Natural and Siltronic had "agreed that [NW Natural] will perform the remedial investigation of contaminants that may have originated from [NW Natural's] activities and may be migrating to Willamette River sediments from the [Siltronic] property, as required by the [2000 DEQ Order]." Barber Decl., Ex. C. However, NW Natural did not agree to indemnify Siltronic from all liability for MGP contamination or even purport to pay any defense costs other than "remedial investigation."

The Cost-Sharing Agreement does not change the analysis. Due to evidence that TCE and MGP contamination had become comingled, Siltronic and NW Natural agreed to "work together and cooperate" and accept responsibility for "the performance of remedial design activities." Moore Decl., Ex. B, pp. 1-2. As an "interim" allocation, Siltronic agreed to pay 7.5% of the costs and to "attempt to achieve a final allocation of Costs through a process of good faith negotiation." *Id*, §§ 6.2 & 8, pp. 3-4. The parties also expressly waived "protection from contribution actions or claims granted by paragraph 77.a of the [2009 Agreement]." *Id*, § 7.1, p. 4. In other words, the Cost-Sharing Agreement contemplated, but did not resolve, the future allocation of costs associated with final remediation or clean-up of the MGP waste, either through contribution claims or voluntary cost allocation. This intent was acknowledged by Siltronic's attorney in an email to Wausau dated July 10, 2009:

> While [NW Natural] has stated its position informally — that they do not intend to try to hold Siltronic liable for MGP material associated with the footprint of their formal operation and their direct discharges to the river, but that they will not pay for the impacts associated with TCE — there is no agreement that formalizes that position. At this stage, it is apparent that TCE impacts complicate the design of the remedy. The proposed agreement is an interim agreement that allows for future allocation

13 – OPINION AND ORDER

>   of design <u>and</u> cleanup costs as part of the larger allocation process,
>   or as contribution claims.

Moore Decl., Ex. A, p. 1 (emphasis in original).

Siltronic's attorney also advised Wausau that NW Natural "does not agree to take responsibility for MGP impacts that result from other parties' redistribution of MGP materials as part of the historical fill operation. . . . [A]ll potential claims between Siltronic and [NW Natural] or relevant third parties are preserved and are not jeopardized by the proposed agreement, but are currently premature." *Id*. He also advised Wausau that "Siltronic likely will have some liability for MGP contamination offshore of its property," as opposed to offshore of NW Natural's property, and that the Cost-Sharing Agreement "encompasses only the remedial evaluation and design work . . . [and] contemplates that there will be a final allocation between the parties . . . ." *Id*, p. 4.

Thus, despite the Cost-Sharing Agreement with NW Natural, Siltronic was and remains liable for MGP-related claims and, thus, is entitled to a defense under the 1978-79 policy. Siltronic asserts that it is not presently seeking a declaration regarding what amounts it is entitled to recover from Wausau as unreimbursed defense expenses. Rather, it only seeks an order that Wausau's duty to defend under the 1978-79 Policy was triggered and that further proceedings will determine whether Wausau has breached that duty. Based on the 2000 DEQ Order, that duty to defend was triggered by the legacy MGP contamination on the Property in 1979.

If Wausau is correct that Siltronic has incurred no defense costs to date for MGP-related claims, then it has not yet breached its duty to defend under the 1978-79 Policy. However, one potential issue raised by the parties can be laid to rest at this point. Wausau requests a declaration that it is not obligated to pay any defense costs incurred by Siltronic prior to June 23, 2003, the date of the tender of defense. Siltronic represented in its tender that it had "incurred

14 – OPINION AND ORDER

significant costs in performing a remedial investigation ordered by DEQ and in cooperating with EPA and others" totaling "in excess of $450,000" to date, adding that the "[w]ork is ongoing and the end is not in sight." Gorman Decl., Ex 1, p. 6.

Based on the "voluntary payments" provision in 1978-79 Policy, Wausau contends that coverage is precluded for any costs incurred by Siltronic without notice to and consent of Wausau. Moore Decl., ¶ 5. Among the policy provisions is the following:

> **4. Insured's Duties in the Event of Occurrence, Claim or Suit**
>
> (a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
>
> (b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.
>
> (c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.*

Complaint, Ex. A, p. 3 (emphasis added).

As a result, Wausau argues that it has no obligation to reimburse any costs Siltronic incurred prior to the date of tender because its payments were voluntary. This court agrees. Under Oregon law, "[a]n insurer is not obligated to defend any action not tendered to it." *Am. Cas. Co. v. Corum*, 139 Or App 58, 63 n3, 910 P2d 1151, 1153 n3 (1996) (citation omitted).

15 – OPINION AND ORDER

"When the duty to defend is at issue, the matter of prejudice from an insured's failure to give notice of the claims is irrelevant." *Or. Ins. Guar. Ass'n v. Thompson*, 93 Or App 5, 11, 760 P2d 890, 894 (1988). Thus, as recognized by other courts, an insurer is not obligated to pay pre-tender costs. *Legacy Partners, Inc. v. Travelers Indem. Co. of Ill.*, 83 Fed App'x 183, 189 (9th Cir 2003) (applying Texas law); *Faust v. Travelers*, 55 F3d 471, 472-73 (9th Cir 1995) (applying California law); *Ash Grove Cement Co. v. Liberty Mut. Ins. Co.*, No. 3:09-cv-00239-KI, 2011 WL 2470109, at *5 (D Or June 20, 2011) (applying Oregon law); *Insua v. Scottsdale Ins. Co.*, 104 Cal App4th 737, 742, 129 Cal Rptr2d 138, 141 (2002) ("The general validity of no-voluntary-payment provisions in liability insurance policies is well established."). Since the 1978-79 Policy makes payment of costs conditional upon providing written notice, Wausau was under no obligation to pay any defense costs incurred by Siltronic prior to its tender of defense on June 23, 2003.

As for defense costs incurred post-tender, Wausau asserts that Siltronic has yet to identify "any defense costs it incurred to respond to legacy MGP contamination claims that did not involve alleged commingling of MGP and TCE." Moore Decl., ¶ 13. Because the 1978-79 Policy does not cover TCE contamination, Wausau has no duty to pay Siltronic's defense costs under that policy related to TCE contamination. However, if defense costs attributable to MGP contamination are commingled with defense costs for TCE contamination, two issues arise. First, who bears the responsibility to segregate those costs? Second, if the costs cannot be segregated, must Wausau pay the commingled costs?

Under Oregon law, an insurer is obligated to defend an entire lawsuit that includes both covered and excluded claims. *Ledford*, 319 Or at 400, 877 P2d at 83. However, the duty to defend is quite different than the duty to determine what defense costs fall within the coverage of

16 – OPINION AND ORDER

the insurance policy. With regard to defense costs, the 1978-79 Policy can only cover damage caused by MGP contamination because the TCE contamination did not occur until March 1980. Because the insured bears the burden of proving that the insurer has breached the policy by failing to pay covered costs, Siltronic bears the responsibility to prove that it has incurred defense costs attributable solely to the MGP contamination covered by the 1978-79 Policy.

## ORDER

For the reasons set forth above, the Second Motion for Partial Summary Judgment filed by Siltronic (docket #141) and joined in by Granite State (docket #147) is GRANTED in part and DENIED in part as follows:

1. GRANTED as to Wausau's duty under the 1978-79 Policy to defend claims for damage arising from legacy MGP contamination on the Property during the policy period;

2. DENIED as to any obligation by Wausau under the 1978-79 Policy to pay defense costs incurred by Siltronic associated with MGP contamination prior to its tender of defense on June 23, 2003;

3. DENIED as to any obligation by Wausau under the 1978-79 Policy to pay defense costs incurred by Siltronic resulting from TCE contamination; and

4. DENIED as premature as to Wausau's breach of its duty to pay defense costs incurred by Siltronic associated with MGP contamination after June 23, 2003.

DATED  October 28, 2014.

                                                    s/ Janice M. Stewart
                                                    _____
                                                    Janice M. Stewart
                                                    United States Magistrate Judge