UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SILTRONIC CORPORATION, a Delaware
corporation

               Plaintiff,

    v.

EMPLOYERS INSURANCE COMPANY
OF WAUSAU, a Wisconsin corporation;
GRANITE STATE INSURANCE
COMPANY, a Pennsylvania corporation;
CENTURY INDEMNITY COMPANY, a
Pennsylvania corporation; and FIREMAN'S
FUND INSURANCE COMPANY, a
California corporation,

               Defendants.

Case No. 3:11-cv-1493-ST

AMENDED OPINION AND
ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Siltronic Corporation ("Siltronic"), filed the underlying action for declaratory

judgment and breach of contract in order to allocate financial responsibility for environmental

claims arising out of the Portland Harbor Superfund Site pursuant to various insurance policies.

Between 1978 and 1986, defendant, Employers Insurance Company of Wausau ("Wausau"),

issued seven annual Comprehensive General Liability Policies to Siltronic.  Complaint, ¶ 9.

Wausau defended Siltronic on various environmental claims until September 2009 when it concluded that the $6 million indemnity limits of the six policies covering the time period from 1980-86 were exhausted. [1]  Cross-claimant, Granite State Insurance Company ("Granite State"), Siltronic's umbrella insurer, then began to pay Siltronic's defense costs.

Siltronic has now filed a Second Motion for Partial Summary Judgment (docket #141) on the limited issue of whether Wausau has a continuing duty to defend Siltronic under its first policy ("1978-79 Policy") and must reimburse Siltronic for unpaid defense costs.  Granite State joins the motion, but disputes the amount of indemnity costs already paid by Wausau as represented by Siltronic (docket #147).  All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons stated, the motions are granted in part, denied in part and deferred in part.

## BACKGROUND

In 1978, Siltronic bought real property located at 7200 NW Front Avenue ("Property") on the southwest shore of the Willamette River in a "heavy industrial" area.  McCue Decl. (docket #145), ¶ 8.

Northwest Natural Gas Company ("NW Natural") owns real property adjacent to the Property.  *Id*, ¶ 9.  The Property and adjacent NW Natural property were once owned as a single parcel by NW Natural's predecessor, the Portland Gas and Coke Company ("GASCO"), on which it operated an oil gasification plant.  *Id*; Burr Decl. (docket #146), Ex. 1, p. 2.  GASCO disposed of the waste generated at the plant, Manufactured Gas Product ("MGP"), in tar ponds now located on the Property from 1940-41 until 1956 when the MGP operations ceased.  Burr

---

[1]  The parties continue to dispute whether the indemnity coverage of the six policies for the years 1980-86, totaling $6 million, is exhausted.

Decl., Ex. 1, p. 2.  This disposal area became known as the "GASCO Sediment Site."  *Id*, Ex. 4, p. 8.  Before Siltronic purchased the Property, the MGP waste was covered up with fill materials, including material from the Willamette River.  McCue Decl., ¶ 9.  Siltronic first learned of these MGP disposal activities and the placement of cover-up fill materials several years after it purchased the Property.  *Id.*

In February 1979, Siltronic began construction of an outfall pipe for treated effluent from the wastewater treatment pipe on the Property to the river.  *Id*, ¶ 11(a)-(b).  The construction required excavation and removal of fill material and a limited amount of submerged sediment along the northeast border of the Property.  *Id.*  On May 18, 1979, the excavation and pile driving activities disturbed oily sediment containing the buried MGP, and Siltronic set up an oil boom in the river to contain surfacing oil.  *Id*, ¶ 11(c)-(d) & Exs. 5-9.  Siltronic deposited the dredge material containing the oil on the riverbank away from the river.  *Id*, ¶ 11(d) & Ex. 11.  Although a dredged material disposal agreement between Siltronic's predecessor, Wacker Siltronic, and the Port of Portland designated Swan Island for disposal of dredging spoil materials, the dredge material remained on the Property.  *Id*, ¶ 11(f)-(g) & Ex. 10.

In March 1980, Siltronic began manufacturing silicone wafers on the Property, generating trichloroethene ("TCE") waste.  Gorman Decl. (docket #142), Ex. 1, p. 3.

On October 4, 2000, DEQ issued an Order ("2000 DEQ Order") requiring Siltronic and NW Natural to "perform a Remedial Investigation" of the Property "to determine the nature and extent of releases of hazardous substances to Willamette River sediments" and "to develop and implement source control measures to address such releases, if necessary."  Burr Decl., Ex. 1, p. 5.  The 2000 DEQ Order included the following findings of fact specifically identifying MGP as one of the "hazardous substances:"

3 – AMENDED OPINION AND ORDER

> The former GASCO plant produced oil gas and lampblack
> briquettes.  Waste generated at the plant included tar, spent oxide, and
> wastewater containing dissolved and suspended hydrocarbons. . . .
> Subsurface petroleum or tar has been encountered before and during
> various construction activities on the [Siltronic] Property after [Siltronic's]
> acquisition of the property.

*Id*, p. 2.

The 2000 DEQ Order also identified NW Natural and Siltronic "[a]s current or past owner or operator of a facility," each of whom is "strictly and jointly and severally liable under ORS 465.255, and therefore may be required by DEQ to conduct any removal or remedial action necessary to protect public health, safety, and welfare and the environment, pursuant to ORS 465.260(4)." *Id*, p. 4.

On December 8, 2000, the EPA issued a Notice of Potential Liability ("2000 EPA Notice") which deemed Siltronic a potentially responsible party ("PRP") for sediment contamination then alleged to exist in a designated section of the Willamette River.  *Id*, Ex. 2, p. 2.  It also stated that Siltronic might "be ordered to perform response actions deemed necessary by EPA [or] DEQ" and "to pay for damages to, destruction of, or loss of natural resources, including the costs of assessing such damages."  *Id*, p. 1.

On June 23, 2003, Siltronic notified Wausau of the EPA and DEQ actions against it. Gorman Decl., Ex. 1.  Wausau, though its administrator, Nationwide Indemnity Company, agreed to pay Siltronic's defense costs subject to a reservation of rights.  *Id*, Ex. 2, p. 4; Burr Decl., Ex. 6, p. 1.  Beginning on or about September 2003, Wausau began paying Siltronic's costs incurred in response to the EPA and DEQ demands.  Complaint, ¶ 29; Moore Decl. (docket #150), ¶ 4.

On February 5, 2004, DEQ issued an Order ("2004 DEQ Order") requiring Siltronic to perform additional remedial investigations and conduct additional source control measures specifically targeting discovery of releases of TCE.  Burr Decl., Ex. 3.

In early September 2009, EPA, NW Natural, Siltronic, and other parties entered into an Administrative Settlement Agreement and Order on Consent for Removal Action ("2009 Settlement Agreement").  *Id*, Ex. 4.  This Agreement made Siltronic and NW Natural "liable for performance of response action and for response costs incurred and to be incurred" related to the GASCO Sediments Site.  *Id*, p. 18.  At the same time, Siltronic and NW Natural entered a Participation and Interim Cost Sharing Agreement ("Cost Sharing Agreement") to jointly conduct the remedial design activities in order to comply with the 2009 Settlement Agreement and allocate the associated costs.  Moore Decl., Ex. B, p. 1.

Also in September 2009, Wausau declared exhaustion of the coverage limits under the six policies issued from 1980-86 and refused to pay any additional defense costs.  *Id*, ¶ 9.  Wausau contends that between 2003 and 2009, it not only paid the full $6 million in indemnity costs under those six policies, but also paid $7,699,837.00 in defense costs, including payments to attorneys, environmental consultants, and others.  *Id*, ¶ 10.

## POLICY PROVISIONS

In 1978, Wausau issued the 1978-79 Policy for the period of August 17, 1978, through January 1, 1980.  Complaint, Ex. A, p. 6.  The provision at issue, which also appears in the other six policies, provides that Wausau will pay:

> all sums which the insured shall become legally obligated to pay as damages because of . . . **property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage**, even if any of the allegations of the suit are groundless,

> false or fraudulent, and may make such investigation and
> settlement of any claim or suit as it deems expedient, but the
> company shall not be obligated to pay any claim or judgment or to
> defend any suit after the applicable limit of the company's liability
> has been exhausted by payment of judgments or settlements.

*Id*, p. 7 (emphasis added).

The 1978-79 Policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected not intended from the standpoint of the insured." *Id*, p. 3. "Property damage" is defined as

> (1) physical injury to or destruction of tangible property which occurs
> during the policy period, including the loss of use thereof at any time
> resulting therefrom, or (2) loss of use of tangible property which has not
> been physically injured or destroyed provided such loss of use is caused
> by an occurrence during the policy period.

*Id.*

The 1978-79 Policy provides $1 million in indemnity liability and requires Wausau to defend Siltronic until the $1 million indemnity limit is exhausted. *Id*, p. 11.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989) (citation omitted). The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the non-moving party." *Bravo v. City of Santa Maria*, 665 F3d 1076, 1083 (9th Cir 2011) (citations omitted).

## DISCUSSION

The environmental claims against Siltronic involve two primary contaminants, MGP and TCE. Siltronic did not begin to use TCE at the Property until March 1980, after expiration of the 1978-79 Policy. Wausau paid Siltronic's defense costs for TCE contamination under its 1980-86 policies until September 2009 when it declared that the indemnity limits of those polices were exhausted. At that point, Granite State began paying Siltronic's defense costs.

Siltronic and Granite State contend that Wausau had, and continues to have, a duty to defend Siltronic in connection with its cleanup responsibilities for MGP contamination under the 1978-79 Policy. Therefore, they seek payment by Wausau of Siltronic's defense costs under the 1978-79 Policy until its $1 million indemnity limit is exhausted. They contend that Wausau's duty to defend under the 1978-79 Policy was triggered due to: (1) contamination of the Property with legacy MGP waste, causing continuous damage and uncontrolled migration; and (2) Siltronic's redistribution of the MGP while constructing an outfall pipe in 1979.

## I.  **Applicable Law**

In this diversity action, Oregon law governs the construction of the Policy. *Larson Constr. Co. v. Oregon Auto. Ins. Co.*, 450 F2d 1193, 1195 (9th Cir 1971) (citation omitted). Under Oregon law, "[a]n insurer has a duty to defend if the claimant can recover against the

insured under the allegations of the complaint on any basis for which the policy affords coverage." *Falkenstein's Meat Co. v. Md. Cas. Co.*, 91 Or App 276, 279, 754 P2d 621, 623 (1988) (citation omitted).  The duty to defend "is determined by comparing the terms of the insurance policy with the allegations of the complaint against the insured." *Drake v. Mut. of Enumclaw Ins., Co.*, 167 Or App 475, 478, 1 P3d 1065, 1068 (2000).

> Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy.  Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured.

*Ledford v. Gutoski*, 319 Or 397, 400, 877 P2d 80, 83 (1994) (*en banc*) (citation omitted).

Conversely, "[i]f the complaint does not contain allegations of covered conduct . . . , then the insurer has no duty to defend." *Abrams v. Gen. Star Indem. Co.*, 335 Or 392, 400, 67 P3d 931, 935 (2003).

## II.    Covered Conduct

### A.    "Suit"

Siltronic claims that it has incurred unpaid defense expenses in excess of $1.6 million associated with the 2000 DEQ Order, 2000 EPA Notice, 2004 DEQ Order, and the 2009 Agreement.  Barber Decl. (docket #149), Ex. A, pp. 3, 5 (Answers to Interrogatories Nos. 27 & 31).  The parties do not dispute that the various EPA and DEQ actions finding Siltronic a potentially responsible party are the equivalent of "suits" under the 1978-79 Policy.  For the purpose of compelling coverage in a general liability insurance policy, ORS 465.480 treats environmental claims as if they were lawsuits:

> Any action or agreement by the [DEQ] or the [EPA] against or with an insured in which the [DEQ] or the [EPA] in writing *directs, requests or agrees* that an insured take action with respect to contamination within the State of Oregon is equivalent to a suit

or lawsuit as those terms as used in any general liability insurance policy.

ORS 465.480(2)(b) (emphasis added); *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 126 Or App 689, 701, 870 F2d 260, 266 (1994) (administrative order to clean up is a "suit").

Instead, the parties dispute whether, as a result of these "suits," Siltronic was liable for property damage resulting from MGP contamination during the policy period.

### B.   "Property Damage" Caused by "Occurrence"

The 1978-79 Policy covers only property damage that occurred during the policy period. Complaint, Ex. A., p. 3. Siltronic contends that property damage occurred in 1979 as a result of the legacy MGP contamination by NW Natural. [2]

Wausau does not contest that the legacy MGP contamination by NW Natural caused covered property damage in 1979, rendering Siltronic, as the owner, potentially liable for remediation of that contamination. However, it argues that it had, and still has, no duty to defend Siltronic under the 1978-79 Policy because: (1) Siltronic only tendered defense to Wausau of the TCE contamination; and (2) Siltronic has incurred no defense costs associated with the MGP contamination.

### 1.   Scope of Tender

Wausau's first argument is easily rejected. Wausau argues that it has no duty to defend Siltronic for any MGP contamination that occurred prior to the production of TCE on the Property in 1980 because Siltronic only tendered coverage for liability stemming from the TCE contamination. Wausau points to Siltronic's three-year delay in notifying Wausau about the

---

[2] Siltronic also contends that covered property damage occurred in 1979 as a result of releasing MGP during its own excavation of the Property. Whether coverage was also triggered by Siltronic's own activity need not be determined at this juncture.

claims as confirming that it was only seeking a defense for claims involving TCE contamination.[3]  However, in its letter dated June 23, 2003, Siltronic tendered to Wausau all "claims for defense and indemnity arising from claims and losses [it] has and will sustain investigating and remediating hazardous wastes contaminating soil and groundwater at" the Property under all of its policies covering the period from 1978 through 1986.  Gorman Decl., Ex. 1, pp. 1-2.  This letter was not limited as to any particular type of hazardous waste.  Siltronic attached both the 2000 DEQ Order and 2000 EPA Notice, and noted the specific findings of fact by DEQ referencing MGP contamination on the Property.  *Id*, p. 4.  The letter also explained that Siltronic:

> has denied many of DEQ's findings and conclusions and; until recently, has demanded that [NW Natural] conduct the work required by the DEQ Order subject to an access agreement that has been negotiated between the parties for that purpose.  [NW Natural] has complied to date.  However, the recent discovery of chlorinated solvents  [TCE] in groundwater below the Property and concerns expressed by DEQ and EPA about the significance of this contamination to the environmental condition of the Portland Harbor and groundwaters of the State have caused [Siltronic] to take a much more active role in the remedial investigation.  As a result, [Siltronic] has spent and expects to spend considerable sums of money to comply with DEQ's Order.

*Id*, p. 5.

Admittedly, the discovery of the TCE contamination prompted Siltronic to tender the claims to Wausau nearly three years after Siltronic received the 2000 DEQ Order and 2000 EPA Notice.  However, Wausau's duty to defend when receiving Siltronic's tender may only be premised on facts alleged in the "suits" tendered to it by Siltronic.  *Ferguson v. Birmingham*

---

[3]  Late notice may bar coverage if an insurer can prove that it has suffered prejudice.  *See Port Servs. Co. v. Gen. Ins. Co. of Am.*, 838 F Supp 1402, 1405 (D Or 1992) (a three-month delay in giving notice was prejudicial and barred coverage); *Carl v. Or. Auto. Ins. Co.*, 141 Or App 515, 525, 918 P2d 861, 866 (1996) (a one-year delay in giving notice was prejudicial and barred coverage).  Despite Siltronic's three-year delay in providing notice, Wausau does not assert late notice as a complete bar to Siltronic's claim.
.

*First Ins. Co.*, 254 Or 496, 505-06, 460 P2d 342, 346 (1969) (*en banc*) ("The insurer's knowledge of facts not alleged in the complaint is irrelevant in determining the existence of the duty to defend and consequently the insurer need not speculate as to what the 'actual facts' of the alleged occurrence may be."). Siltronic clearly gave notice of and tendered its claims for defense and indemnity to Wausau arising from the claims in the 2000 DEQ Order and 2000 EPA Notice. Although the attached 2000 DEQ Order did not state when the "occurrence" happened in 1979, it found that Siltronic acquired the Property in 1978 (Burr Decl., Ex. A, ¶ 2(B)), that the former GASCO plant discharged hazardous substances, including MGP, into ponds located on the Property beginning in 1941 (*id*, ¶ 2(D)), that "[s]ubsurface petroleum or tar has been encountered before and during various construction activities on the [Siltronic] Property after [Siltronic's] acquisition of the property" (*id*, ¶ 2(E)), and that Siltronic, as the current owner, is required to remediate all contamination on the Property. *Id*, ¶ 3(E). Accordingly, Wausau was notified of legacy MGP contamination since 1941 and continuing through 2000 which includes the 1978-79 Policy period.

Thus, contrary to Wausau's position, Siltronic's tender of defense in 2003 included all past, present, and future costs to comply with the 2000 DEQ Order and 2000 EPA Notice, including removal or remedial action relating to legacy MGP contamination.

## 2.   **Defense Costs Incurred**

Wausau acknowledges that it may have a future duty to defend Siltronic under the 1978-79 Policy if and when NW Natural or any other party makes a claim against Siltronic for contribution for any remediation costs attributable to the MGP contamination. However, Wausau asserts that it had, and continues to have, no duty to defend under the 1978-79 Policy because Siltronic has not yet incurred any defense costs relating to legacy MGP contamination.

Instead, NW Natural assumed full liability for its legacy MGP contamination and agreed to pay

all associated remediation costs. As explained by Nationwide's Specialty Consultant:

> I understood that Siltronic was not incurring costs to respond to legacy MGP contamination because [NW Natural] had accepted responsibility for addressing those claims. I monitored the invoices submitted by Siltronic's attorneys and environmental consultants to confirm that they were not billing for work to address legacy MGP contamination. I specifically requested that Siltronic identify any costs incurred to address legacy MGP contamination, as I would seek recovery of funds from responsible party [NW Natural]. Siltronic informed me that its involvement in the response to MGP claims was limited to situations where MGP waste has become commingled with TCE waste generated by Siltronic's manufacturing operations at the site, which began in March 1980. . . .

> Based on Siltronic's representations that it was not paying any costs associated with legacy MGP contamination, I concluded that there was no coverage under the Wausau policy issued for the period from August 17, 1978 to January 1, 1980, because Siltronic had not conducted any operations at the site involving TCE until March 1980.

Moore Decl., ¶¶ 6-7.

Under Oregon law, the duty to defend "is determined by comparing the terms of the

insurance policy and the facts alleged in the complaint against the insured." *Drake*, 167 Or App

at 478, 1 P3d at 1068. A determination of liability is not needed to trigger a duty to defend. By

comparing the terms of the 1978-79 Policy and the 2000 DEQ Order (the equivalent of "the

complaint against the insured"), Wausau clearly had a duty to defend Siltronic for claims arising

from MGP contamination. Under the 2000 DEQ Order, Siltronic is "strictly and jointly and

severally liable under ORS 465.255, and therefore may be required by DEQ to conduct any

removal or remedial action necessary." Burr Decl., Ex. 1, p. 4. That action related to releases of

"hazardous substances to Willamette River sediments" which included MGP generated at the

former GASCO plant and discharged into the Willamette River and tar ponds now located on the

Property.  *Id*, ¶¶ 1, 2(D).  Thus, the 2000 DEQ Order alleges that Siltronic is potentially liable for "property damage" caused by an "occurrence" within the 1978-79 Policy coverage period.

As Wausau points out, NW Natural acknowledged its role as the operator of the former GASCO plant and prior owner of the Property and agreed to pay for MGP remedial investigation.  As confirmed by the November 10, 2000 letter to DEQ, NW Natural and Siltronic had "agreed that [NW Natural] will perform the remedial investigation of contaminants that may have originated from [NW Natural's] activities and may be migrating to Willamette River sediments from the [Property], as required by the [2000 DEQ Order]."  Barber Decl., Ex. C. However, NW Natural did not agree to indemnify Siltronic from all liability for MGP contamination or even purport to pay any defense costs other than "remedial investigation."

Due to evidence that TCE and MGP contamination had become commingled, Siltronic and NW Natural entered into the Cost Sharing Agreement in 2009 to "work together and cooperate" and accept responsibility for "the performance of remedial design activities."  Moore Decl., Ex. B, pp. 1-2.  As an "interim" allocation, Siltronic agreed to pay 7.5% of the costs and to "attempt to achieve a final allocation of Costs through a process of good faith negotiation."  *Id*, §§ 6.2 & 8, pp. 3-4.  The parties also expressly waived "protection from contribution actions or claims granted by paragraph 77.a of the Administrative Settlement."  *Id*, § 7.1, p. 4.  In other words, the Cost Sharing Agreement contemplated, but did not resolve, the future allocation of costs associated with final remediation or cleanup of the MGP waste, either through contribution claims or voluntary cost allocation.  In an email to Wausau dated July 10, 2009, Siltronic's attorney acknowledged this intent:

> While [NW Natural] has stated its position informally — that they do not intend to try to hold Siltronic liable for MGP material associated with the footprint of their formal operation and their direct discharges to the river, but that they will not pay for the

> impacts associated with TCE — there is no agreement that
> formalizes that position.  At this stage, it is apparent that TCE
> impacts complicate the design of the remedy.  The proposed
> agreement is an interim agreement that allows for future allocation
> of design <u>and</u> cleanup costs as part of the larger allocation process,
> or as contribution claims.

Moore Decl., Ex. A, p. 1.

Siltronic's attorney also advised Wausau that NW Natural "does not agree to take responsibility for MGP impacts that result from other parties' redistribution of MGP materials as part of the historical fill operation. . . .  [A]ll potential claims between Siltronic and [NW Natural] or relevant third parties are preserved and are not jeopardized by the proposed agreement, but are currently premature." *Id*.  He further warned Wausau that "Siltronic likely will have some liability for MGP contamination offshore of its property," as opposed to offshore of NW Natural's property, and that the Cost Sharing Agreement "encompasses only the remedial evaluation and design work . . . [and] contemplates that there will be a final allocation between the parties to be determined in the context of the larger harbor-wide allocation process by sediment management areas (SMAs) as well as among and between SMAs." *Id*, p. 4.

Under Oregon law, even if some allegations involve conduct not covered by the policy, the duty to defend arises "if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy." *Ledford*, 319 Or at 400.  This "complete defense" rule does not permit an insurer to pay defense costs only for covered claims and require the insured to defend uncovered claims in the same lawsuit.  Only exhaustion of the policy limits or elimination of the covered claims extinguishes an insurer's duty to defend. *See City of Medford v. Argonaut Ins. Grp.*, No. 1:06-CV-3098-PA, 2012 WL 2367184, at *1 (D Or June 21, 2012) ("when a judgment eliminates all covered claims against the insured, and the dismissal of the covered claims is not appealed, the insurer no longer has a duty to defend"). *But see Klamath*

14 – AMENDED OPINION AND ORDER

*Pac. Corp. v. Reliance Ins. Co.*, 151 Or App 405, 418, 950 P2d 909, 916 (1997) *opinion adhered to as modified on reconsideration*, 152 Or App 738, 955 P2d 340 (1998) ("An intermediate order from a trial court dismissing a claim is not a final resolution of that claim.").

Because the Cost Sharing Agreement is only an interim agreement and does not permanently settle issues of Siltronic's indemnity for MGP legacy contamination, it does not stay, terminate, or otherwise discharge Siltronic's duty to defend.  As long as Siltronic is exposed to potential liability for legacy MGP contamination, Wausau has a duty to defend Siltronic under the 1978-79 Policy in order to comply with the 2000 DEQ Order and 2000 EPA Notice with respect to all potential contaminants on the Property.  Wausau's duty to defend Siltronic terminates only when all claims covered by the 1978-79 Policy related to MPG[4] are settled, dismissed, or otherwise reach final resolution, or when the $1 million indemnity limit of the 1978-79 Policy is exhausted.

### 3.    Breach of Duty to Defend

Siltronic asserts that it is not presently seeking a declaration as to what amount it is entitled to recover from Wausau as unreimbursed defense expenses.  Rather, it only seeks an order that Wausau's duty to defend under the 1978-79 Policy was triggered in 2003 by the tender of defense and that further proceedings will determine whether Wausau has breached that duty.

The problem facing Wausau is that the 1978-79 Policy only covers indemnity for losses caused by MGP contamination, and not TCE contamination that did not occur until March 1980. Pursuant to the Cost Sharing Agreement, NW Natural has been paying all defense costs related

---

[4] Property damage caused by contaminants other than TCE and MPG could trigger coverage under the 1978-79 Policy if it occurred during that one-year policy period.  There is no such evidence in the record at this time.

to MGP contamination.[5]  On the other hand, due to the Cost Sharing Agreement, Siltronic has

not yet incurred any defense costs related to legacy MGP contamination.  Either way, Wausau

may never exhaust the $1 million indemnity limit under the 1978-79 Policy and could end up

paying all of Siltronic's defense costs until the underlying EPA and DEQ actions are finally

resolved.  Because Siltronic has incurred no defense costs to date for MGP-related claims,

Wausau asserts that it owes nothing to Siltronic (or Granite State) and is entitled to a

determination at this juncture that it has not yet breached any duty to defend under the 1978-79

Policy.

 As discussed below, Wausau did not breach its duty to defend by failing to pay pre-tender

defense costs, and it is premature to determine whether Wausau breached its duty to defend post-

tender and, in particular, after September 2009 when it ceased paying Siltronic's defense costs.

### a. <u>Pre-Tender Defense Costs</u>

 Wausau requests a declaration that it is not obligated to pay any defense costs incurred by

Siltronic prior to June 23, 2003, the date of the tender of defense.  Siltronic represented in its

tender that it had "incurred significant costs in performing a remedial investigation ordered by

DEQ and in cooperating with EPA and others" totaling "in excess of $450,000" to date, adding

that the "[w]ork is ongoing and the end is not in sight."  Gorman Decl., Ex 1, p. 6.

 The 1978-79 Policy contains the following "voluntary payments" provision:

> **4.  Insured's Duties in the Event of Occurrence, Claim or Suit**
>
> (a) In the event of an occurrence, written notice containing
> particulars sufficient to identify the insured and also reasonably
> obtainable information with respect to the time, place and
> circumstances thereof, and the names and addresses of the injured

---

[5] As explained by emails between Siltronic's attorney and Moore, the 7.5% that Siltronic agreed to pay under the Cost Sharing Agreement, represented the percentage of remedial design work associated with the TCE commingled with MGP legacy contamination.  Moore Decl., Ex. A.

and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.*

Complaint, Ex. A, p. 3 (emphasis added).

Based on that provision, coverage is precluded for any costs incurred by Siltronic without notice to and consent of Wausau, which includes those incurred prior to the date of tender of defense. Under Oregon law, "[a]n insurer is not obligated to defend any action not tendered to it." *Am. Cas. Co. v. Corum*, 139 Or App 58, 63 n3, 910 P2d 1151, 1153 n3 (1996) (citation omitted). "When the duty to defend is at issue, the matter of prejudice from an insured's failure to give notice of the claims is irrelevant." *Or. Ins. Guar. Ass'n v. Thompson*, 93 Or App 5, 11, 760 P2d 890, 894 (1988). Thus, as recognized by other courts, an insurer is not obligated to pay pre-tender costs. *Legacy Partners, Inc. v. Travelers Indem. Co. of Ill.*, 83 Fed App'x 183, 189 (9th Cir 2003) (applying Texas law); *Faust v. Travelers*, 55 F3d 471, 472-73 (9th Cir 1995) (applying California law); *Ash Grove Cement Co. v. Liberty Mut. Ins. Co.*, No. 3:09-cv-00239-KI, 2011 WL 2470109, at *5 (D Or June 20, 2011) (applying Oregon law); *Insua v. Scottsdale Ins. Co.*, 104 Cal App4th 737, 742, 129 Cal Rptr2d 138, 141 (2002) ("The general validity of no-voluntary-payment provisions in liability insurance policies is well established.").

Since the 1978-79 Policy makes payment of costs conditional upon providing written notice, Wausau was under no obligation to pay any defense costs incurred by Siltronic prior to its tender of defense on June 23, 2003.

**b.       Post-Tender Defense Costs**

After Wausau accepted Siltronic's tender of defense, it paid all of Siltronic's defense costs for the underlying EPA and DEQ actions for TCE contamination, including commingling of MGP with TCE, until it concluded that coverage was exhausted under the 1980-86 policies in September 2009. Moore Decl., ¶¶ 6-7. Although Wausau has not paid any defense costs since 2009,[6] it asserts that it has not breached its duty to defend because Siltronic has yet to identify any unpaid defense costs that are covered by the 1978-79 Policy. According to Wausau, "Siltronic has not incurred any 'costs to respond to legacy MGP contamination because [NW Natural] had accepted responsibility for addressing those claims" and informed Wausau "that its only involvement in the response to MGP claims was limited to situations where MGP waste had become commingled with TCE waste," which Wausau paid as required by the 1980-86 policies. Moore Decl., ¶ 6. "Siltronic has never identified any defense costs it incurred to respond to legacy MGP contamination claims that did not involve alleged commingling of MGP and TCE." *Id*, ¶ 13. In essence, NW Natural has been voluntarily acting as Siltronic's insurer for legacy MGP contamination.

As discussed above, even if the EPA and DEQ actions include TCE and other contaminants in addition to legacy MGP, Wausau has a duty to defend those uncovered claims under Oregon's "complete defense" rule. However, Wausau may be entitled to reduce its liability for future defense costs to the extent it can show exclusion from coverage under the

---

[6] After Wausau stopped defending Siltronic, Granite State has paid Siltronic's defense costs. Therefore, Granite State is the party who will appear to benefit if Wausau has breached its duty to defend Siltronic under the 1978-79 Policy.

1978-79 Policy. Based on the following rule, several other "complete defense" states have

apportioned defense costs between expenses related to covered claims and those related to

ultimately excluded claims when "the distinction can be readily made:"

> An insurer must bear the entire cost of defense when there is no reasonable means of prorating the costs of defense between the covered and the not-covered items. Thus, in the typical situation, suit will be brought as the result of a single accident, but only some of the damages sought will be covered under the insurance policy. In such cases, apportioning defense costs between the insured claim and the uninsured claim is very difficult. As a result, courts impose the full cost of defense on the insurer.
> These considerations do not apply where defense costs can be readily apportioned. The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk.

*Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F2d 1212, 1225–26 (6th Cir 1980)

(citation and internal quotation marks omitted), *decision clarified on reh'g*, 657 F2d 814 (6th Cir

1981), *cert. denied* 454 US 1109 (1982).

Although this rule was developed to apportion defense costs between primary insurers of

a single covered event, some courts have applied it in the context of apportioning defense costs

when a single insurer has breached its duty to defend. *See, e.g, Budd Co. v. Travelers Indem.*

*Co.*, 820 F2d 787, 790–91 (6th Cir 1987) (Michigan law); *Okada v. MGIC Indem. Corp.*, 823 F2d

276 (9th Cir 1986) (Hawaii law) ("If an action against the directors incorporates both covered and

uncovered claims, the parties must apportion the costs so that [the insurer] need only pay for

amounts generated in defense of covered claims."); *see also Enron Corp. v. Lawyers Title Ins.*

*Corp.*, 940 F2d 307, 311 (8th Cir 1991) (applying similar rule under Virgin Islands law without

citing *Forty-Eight*); *Harborside Refrigerated Servs., Inc. v. IARW Ins. Co.*, 759 F2d 829, 831 (11th Cir 1985) (same under Florida law).

Oregon has not decided this precise issue, but precedent suggests that Wausau may not have to pay for Siltronic's defense costs that NW Natural has agreed to pay under the Cost Sharing Agreement. Under *Lamb-Weston, Inc. v. Or. Auto. Ins. Co.*, 219 Or 110, 341 P2d 110 (1959), Oregon courts apply a scheme of pro rata apportionment to divide a loss when two or more insurers cover the same loss (and contain an "other insurance" clause). That scheme also applies to apportioning defense costs:

> The issue is whether, when only one insurer defends, defense costs are to be prorated in accordance with the proportion that each insurer's coverage bears to the total coverage or whether the costs of defense should be treated separately from the rest of the loss and divided equally between the insurers which had the duty to defend. We believe that the costs of defense should be governed by the same rule as the rest of the loss and should be prorated.

*Burnett v. W. Pac. Ins. Co.*, 255 Or 547, 555, 469 P2d 602, 606 (1970) (*en banc*).

Nonetheless, the apportionment doctrine under Oregon law has "no effect on each insurer's independent obligations to make the insured whole to the extent of its applicable policy limits." *Cascade Corp. v. Am. Home Assur. Co.*, 206 Or App 1, 7, 135 P3d 450, 454 (2006).

> [F]rom the perspective of the insurers, the existence of other insurance is purely fortuitous. One insurer cannot expect there to be another applicable policy covering the same risk; rather, in issuing its policy, each insurer has to assume that it will be liable for any loss to the full extent of the policy limits.

*Id* at 8, 135 P3d at 455.

Here Siltronic, as the insured, has voluntarily limited its liability for defense costs and indemnity for legacy MGP contamination by entering into the Cost Sharing Agreement. Under the reasoning in *Burnett*, Wausau can make a credible argument that until such time as Siltronic

incurs defense costs for legacy MGP contamination, it should only have to bear the defense costs that correspond to Siltronic's portion of liability under the Cost Sharing Agreement associated with TCE (and "other contaminants" not assumed by either party under the Cost Sharing Agreement) which it has already paid in accordance with the 1980-86 Policies.  If such a position is successful, then Wausau has not yet breached its duty to defend Siltronic under the 1978-79 Policy and will not do so until Siltronic actually incurs defense costs for legacy MGP contamination covered under the 1978-79 Policy.

However, the parties have not had an opportunity to fully address this issue.  Therefore, the court defers any ruling as to whether Wausau breached its duty to defend under the 1978-79 Policy post-tender and, in particular, when it ceased paying any of Siltronic's defense costs in September 2009.

## <u>AMENDED ORDER</u>

For the reasons set forth above, the Second Motion for Partial Summary Judgment filed by Siltronic (docket #141) and joined in by Granite State (docket #147) is GRANTED in part, DENIED in part, and DEFERRED in part as follows:

1.  GRANTED as to Wausau's duty under the 1978-79 Policy to defend claims for damage arising from contamination from legacy MGP (and other contaminants, not including TCE, covered by the DEQ and EPA actions) on the Property during the policy period;

2.  DENIED as to any obligation by Wausau under the 1978-79 Policy to pay defense costs incurred by Siltronic prior to its tender of defense on June 23, 2003;

3.  DENIED as to any obligation by Wausau under the 1978-79 Policy to pay defense costs incurred by Siltronic resulting from TCE contamination; and

///

4.  DEFERRED as to whether Wausau has breached its duty to defend under the 1978-79 Policy after the tender of defense on June 23, 2003.

DATED January 14, 2015.

s/ Janice M. Stewart

_____

Janice M. Stewart
United States Magistrate Judge