UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SILTRONIC CORPORATION, a Delaware
corporation,

                Plaintiff,                        Case No. 3:11-cv-1493-ST

        **v.**                                 **OPINION AND ORDER**

EMPLOYERS INSURANCE COMPANY
OF WAUSAU, a Wisconsin corporation; and
GRANITE STATE INSURANCE
COMPANY, a Pennsylvania corporation;

                Defendants.

STEWART, Magistrate Judge:

<u>**INTRODUCTION**</u>

On December 9, 2011, plaintiff, Siltronic Corporation ("Siltronic"), filed this action for

declaratory judgment and breach of contract in order to allocate financial responsibility for

environmental claims arising out of the Portland Harbor Superfund Site pursuant to various

insurance policies.  Between 1978 and 1986, defendant, Employers Insurance Company of

Wausau ("Wausau"), issued seven annual Comprehensive General Liability Policies to Siltronic.

Complaint, ¶ 9.  Wausau paid approximately $7.7 million for Siltronic's defense costs on various

environmental claims from 2003 until September 2009 when it concluded that it had exhausted the $6 million indemnity limits of six of the seven policies covering the time period from 1980-86. Cross-claimant, Granite State Insurance Company ("Granite State"), Siltronic's umbrella insurer, then began to pay Siltronic's defense costs while reserving the right to dispute Wausau's claim of exhaustion.[1]

In February 2013, this court denied Siltronic's Motion for Partial Summary Judgment (docket #50) and declared that if Wausau has paid $6 million in indemnity costs incurred by Siltronic pursuant to Orders and Agreements by the Oregon Department of Environmental Quality ("DEQ") and the Environmental Protection Agency ("EPA"), then it has exhausted its liability on six policies at issue covering 1980-86 (docket #62). However, the parties dispute whether Wausau has exhausted its $6 million of indemnity limits for those six policies.

In March 2014, this court granted in part and denied in part Granite State's Motion for Partial Summary Judgment (docket #71) relating to Wausau's characterization of certain costs as indemnity costs (docket #132).

In July 2014, Siltronic filed a Second Motion for Partial Summary Judgment (docket #141) on the limited issue of whether Wausau has a continuing duty to defend Siltronic under its first policy ("1978-79 Policy") and must reimburse Siltronic for unpaid defense costs. The parties disagreed as to whether the only defense costs incurred by Siltronic involve TCE contamination which could not have occurred during the policy period[2] or whether some of the environmental claims may involve MGP contamination that occurred during the policy period. Granite State joined the motion, but disputed the amount of indemnity costs already paid by

---

[1] Two other defendants, Century Indemnity Company and Fireman's Fund Insurance Company, Siltronic's umbrella insurers, have been dismissed without prejudice (docket #171).

[2] Siltronic did not begin to use TCE in its operations until March 1980.

Wausau as represented by Siltronic (docket #147).  On October 28, 2014 (docket #154, amended by dockets #162, #164 & #194), this court ruled that Wausau had a duty to defend Siltronic under the 1978-79 Policy, but deferred any ruling as to whether Wausau has breached the duty to defend.

Wausau has now filed a Motion for Partial Summary Judgment (docket #190) seeking an order that:

1. Siltronic's payment of its share of Phase 2 of the Natural Resources Damage Assessment ("NRDA") should be treated as indemnity costs;[3]

2. Wausau's payment to the Lower Willamette Group ("LWG") to fund Siltronic's share of a settlement between the LWG and the Oregon Department of Environmental Quality ("DEQ") should be treated as indemnity costs;

3.  Costs that Siltronic agreed to pay under a settlement agreement with the Environmental Protection Agency ("EPA") for remedial design activities are properly characterized as indemnity costs; and

4. Wausau is not required by ORS 465.483 to pay the fees of two sets of defense counsel for Siltronic, one retained by Wausau and one retained by Siltronic.

For the reasons set forth below, Wausau's motion is granted in part and denied in part.

## <u>LEGAL STANDARD</u>

Summary judgment may be granted if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  FRCP 56(c).  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

---

[3] Wausau's supplemental briefing (docket #224) characterizes its motion more broadly as seeking an order that any payment made to fund the NRDA should be treated as indemnity costs.  The court confines its analysis to the original scope of the motion.

pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court does "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999), citing *Summers v. A. Teichert & Son, Inc.* 127 F3d 1150, 1152 (9th Cir 1997). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989), quoting *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 249–50, 252 (1986). The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000). The court must view the inferences drawn from the facts "in the light most favorable to the non-moving party." *Bravo v. City of Santa Maria*, 665 F3d 1076, 1083 (9th Cir 2011), citing *Delia v. City of Rialto*, 621 F3d 1069, 1074 (9th Cir 2010).

## DISCUSSION

## I.    Indemnity v. Defense Costs

### A.    Rebuttable Presumption

Oregon law establishes the following rebuttable presumptions for categorizing environmental expenditures by insurers:

> (a) There is a rebuttable presumption that the costs of *preliminary assessments, remedial investigations, risk assessments or other necessary investigation*, as those terms are defined by rule by the Department of Environmental Quality, are *defense costs* payable by the insurer, subject to the provisions of the applicable general liability insurance policy or policies.
>
> (b) There is a rebuttable presumption that payment of the costs of *removal actions or feasibility studies*, as those terms are defined by rule by the Department of Environmental Quality, are *indemnity costs* and reduce the insurer's applicable limit of liability on the insurer's indemnity obligations, subject to the

provisions of the applicable general liability insurance policy or
policies.

ORS 465.480(7) (emphasis added).

Under the first category of defense costs, a "preliminary assessment" is defined as "an investigation conducted in accordance with OAR 340-122-0072 for the purpose of determining whether additional investigation, removal, remedial action, or related engineering or institutional controls are needed to assure protection of public health, safety and welfare, and the environment."  OAR 340-122-0115(42).  A "remedial investigation" is a process undertaken after the preliminary assessment "to develop the need for remedial action" and may include "characterization of hazardous substances, characterization of the facility, performance of baseline health and ecological risk assessments, and collection and evaluation of information relevant to the identification of hot spots of contamination."  OAR 340-122-0080(1) & (2).  A "risk assessment" is defined as:

> the process used to determine the probability of an adverse effect due to the presence of hazardous substances.  A risk assessment includes identification of the hazardous substances present in the environmental media; assessment of exposure and exposure pathways; assessment of the toxicity of the hazardous substances; characterization of human health risks; and characterization of the impacts or risks to the environment.

OAR 340-122-0115(49).

In contrast, the second category of indemnity costs includes "removal actions or feasibility studies."  The statute defines "removal" as "the cleanup or removal of a released hazardous substance from the environment.'  ORS 465.200(25).  Although not expressly referenced in the statute, removal also necessarily includes a "remedial action" which is defined as "a permanent remedial action taken instead of or in addition to removal actions" to prevent or minimize contamination.  ORS 465.200(23).  Both of those terms "*may include* investigations,

treatment, excavation and offsite disposal, engineering controls, institutional controls, any combination thereof."  OAR 340-122-0115(45) (emphasis added).  If a remedial action is necessary, a "feasibility study" is then undertaken to "develop and evaluate a range of remedial action alternatives acceptable to [DEQ]."  OAR 340-122-0085(2).

Wausau purports to have followed ORS 465.480(7) in categorizing its payments on Siltronic's behalf as either defense or indemnity costs.  Granite State disagrees, contending that Wausau mischaracterized certain payments to Siltronic as indemnity costs, causing a premature exhaustion of its coverage limits.  Granite State previously disputed various payments which the court has resolved (docket #132).  Wausau now seeks a determination that three other categories of payments are indemnity costs.

### B.    Legal Standard

As explained in the prior Opinion and Order (docket #132), this court has adopted the approach set forth in *Endicott Johnson Corp. v. Liberty Mut. Ins. Co.*, 928 F Supp 176 (NDNY 1996), for resolving whether a cost should be characterized as defense or indemnity.  The *Endicott* approach determines the proper category of costs according to the substance of the underlying work by governmental agencies, attorneys, and environmental consultant, and not by the posture of the party performing the work.  *Id* at 184 & n2 ("It does not matter, for example, who incurred the expense initially (thus EPA oversight costs are included) . . . .").

Wausau urges this court to depart from the *Endicott* approach and characterize costs according to the parties who incurred them.  Often in environmental cleanup projects, the state and federal environmental agencies not only bring the claims against the potentially responsible parties ("PRPs") to remedy the contamination, but also perform and oversee the assessment of the environmental damage.  In Wausau's view, a cost paid to an adversary or to reimburse an

insured's payment to an adversary, enjoys the coercive powers of the government that is seeking to impose liability for alleged contamination and resulting damage to natural resources. Wausau argues that paying an adversary to assess the extent of liability and perfect its claim is similar to paying a prevailing party's attorney fees as part of the final judgment and, thus, constitutes an indemnity cost.

However, paying the prevailing party's attorney fees is not an apt comparator in the context of environmental claims. Under CERCLA, the PRP must pay practically all reasonable and necessary costs of assessing the extent of contamination and liability. If the governmental entities or their counterparts, such as the Natural Resource Trustees ("NRT"), incur expenses early in the litigation, then they can recoup those costs from the PRPs in a settlement or judgment. These recoverable costs include "all costs of removal or remedial action" which are not inconsistent with the national contingency plan and the "damages for injury to, destruction of, or loss of natural resources." 42 USC § 9607(a)(4); *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F3d 564, 569 (10th Cir 1996) (to avoid liability, a PRP is required to prove that the government's cleanup actions were inconsistent with the national contingency plan). This statutory language encompasses a broad scope of activity, including work characterized as defense costs under Oregon law. *See* 42 USC § 9601(23) ("such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances"). Thus, under Wausau's approach, any cost paid to the adversary in a CERCLA claim would be an indemnity cost and not allow a fair allocation of the costs between the defense and indemnity provisions of the policy as required by the statutory presumptions in ORS 465.480(7). *See id* at 183, citing *Gen. Accident Ins. Co. of Am. v. New Jersey*, 143 NJ 462, 476, 672 A2d 1154, 1162 (1996). Therefore, consistent with the *Endicott* approach, the court will not consider whether the payment was made

to an adversary (DEQ, EPA, or NRT) or was a recoverable cost under the statute that requires the policyholder to pay the cost. *See Endicott*, 928 F Supp at 184 n2. Instead, consistent with this court's prior ruling:

> To the extent that an expense is primarily attributable to remedial investigations — which address the sources and extent of the contamination, whether environmental damage can be mitigated by controlling the sources, or whether additional action is necessary because of migration of contaminants from the site — the expense will be treated as a defense cost. To the extent an expense is primarily attributable to feasibility studies — which comprise plans for selecting and implementing the remediation alternative for the site — the expense will be treated as damages to be indemnified. Finally, to the extent the Court cannot determine based on written submissions whether an expense is attributable to either RI or FS, the Court will have broad discretion to allocate the expense in an equitable manner.

*Id* at 184.

### C.    Settlements between Wausau and Siltronic

Wausau has agreed to pay for Siltronic's share of the LWG fund pursuant to an agreement with Siltronic that treats the payment as an indemnity cost. The 2007 Agreement to Fund Settlement of State Claims states that Wausau's payment of Siltronic's share of the LWG fund was "intended to indemnify Siltronic for Siltronic's liability to DEQ for its past remedial action costs and interim remedial action costs." Complaint, Ex. F, p. 3.

Similarly, in 2008, prior to the exhaustion of the 1980-86 Wausau policies, Siltronic and Wausau entered into an Agreement to Fund Interim Participation in Natural Resource Injury Assessment ("2008 Agreement"). *Id*, Ex. G. That agreement contained a nearly identical provision stating that the payment was "intended to indemnify Siltronic for Siltronic's liability to the NRT for a portion of the natural resource injury assessment costs under CERCLA Section 107." Complaint, Ex. G, p. 3, ¶ 5.

Wausau argues that when a settlement between a policyholder and its insurer labels an expense as an indemnity cost, the terms of the agreements dictates the characterization throughout the litigation of the environmental claim. Although true as between Wausau and Siltronic, Granite State argues that such agreements are not binding on other insurers who are not parties to the agreement and retain the right to seek contribution for defense costs from the primary insurer. Settlement agreements are generally favored and are enforceable so long as they are entered into in good faith. *G.F. Hodges Agency v. Rees*, 202 Or 139, 157, 272 P2d 216, 224 (1954). However, in the area of insurance coverage for environmental contamination claims, an equitable right to contribution among insurers under ORS 465.480(4) cannot be extinguished by settlement. *Certain Underwriters at Lloyd's London & Excess Ins. Co. v. Mass. Bonding & Ins. Co.*, 235 Or App 99, 116, 230 P3d 103, 114 (2010) (public policy favoring settlements did not merit departing from the common-law rule governing equitable contribution). Issues of equity raised by environmental claims underpin the importance of preserving an excess carrier's right of contribution for costs:

> In these actions, unlike more typical disputes, defense costs might easily exceed the amounts that were within the reasonable expectation of an insurer and its insured when the policy was purchased. In such actions, determining and allocating liability and damages may take many years, and may require an insurer to cover as "defense" costs, the expense of preliminary investigations, remedial investigations, and risk assessments that may not have traditionally been considered as costs of defense . . . . In these actions, the costs of defense may be so onerous that an insurer . . . might chose to simply tender the policy limits early in the litigation against its insured in order to avoid ongoing defense obligations, while it might have been expected to maintain a vigorous defense in a less complex action reasonably expected to require a less costly defense.

*Evraz Or. Steel Mills, Inc. v. Cont'l Ins. Co.*, No. CV 08-447-JE, 2009 WL 789658, at *14 (D Or Mar. 20, 2009), citing *Fireman's Fund Ins. Co. v. Ed Niemi Oil Co., Inc.*, 436 F Supp2d 1174, 1176 (D Or 2006), *rev'd on other grounds,* 2008 WL 4946279 (9th Cir Nov 6, 2008).

Granite State has filed a cross-claim in this case seeking contribution from Wausau for defense costs it paid after Wausau declared its policies exhausted. A settlement term that characterizes costs in a manner that prevents another of the policyholder's insurers from seeking contribution should not be enforceable against the non-settling insurer. While the agreements between Wausau and Siltronic operated to apply these expenses towards Wausau's policy limits, it did not determine the characterization of those costs in future actions between Wausau and other insurers.

### D.   **LWG Fund Payment**

Wausau had paid $49,920.00 to fund Siltronic's share of a settlement between the members of the LWG (a group of PRPs) and DEQ. The settlement agreement between the LWG and DEQ was memorialized in a Consent Judgment (docket #1-6, p. 12) and resolved the underlying environmental claims brought by DEQ. As explained in a letter from Mr. Gladstone, Siltronic's defense attorney at the time, to Mr. Moore, Wausau's representative, the Consent Judgment settled the liability of the members of the LWG for DEQ's "costs incurred in investigation of the harbor and identifying PRPs in advance of formation of the LWG" and released "those parties from liability for the [DEQ's] claims under both State law and CERCLA related to the in-river RI/FS work." Campagne Decl. (dockets #203 & #204), Ex. 10, p. 2 & Ex. 17.

Wausau contends that this payment is presumptively an indemnity cost because it generally resolves DEQ's claims against the LWG made in connection with the Consent Judgment. However, this argument is premised on who receives the funds which, as discussed above, is irrelevant. Instead, the issue is the substance of the work for which the payment was made.

Granite State characterizes the payment as defense costs under ORS 465.480(7)(a) because it reimbursed remedial investigation costs incurred by DEQ. This characterization is consistent with the *Endicott* approach. As explained by Siltronic to Wausau, it settled Siltronic's liability to the LWG for DEQ's investigation costs to identify PRPs. Even though any settlement payment resolves a party's liability to an adversary, the issue presented when applying Oregon's statutory presumptions is the nature of the liability being settled. Here, the record is clear that the LWG settlement was to pay for defense costs under ORS 465.480(7).

### E.    NRDA Payment

Under CERCLA, in addition to the costs of remedial investigation and cleanup, a party responsible for a release of hazardous substances is also liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 USC § 9607(a)(4)(B). Those costs are assessed through a NRDA under rules promulgated by the United States Department of Interior. *See* 43 CFR §§ 11.10-11.93. The NRDA for the Portland Harbor Superfund Site has four phases: Phase 1, the development of an Injury Assessment Plan; Phase 2, the implementation of a settlement-oriented assessment; Phase 3, the completion of the NRDA; and Phase 4, recovery of damages from non-settling PRPs.[4] Campagne Decl., Ex. 18, pp. 18-19. Siltronic and other PRPs were obligated to pay for these costs. Moore Decl. (docket #191), ¶ 17.

The 2008 Agreement between Wausau and Siltronic was reached in response to an Interim Funding and Participation Agreement ("Interim FPA") between the NRT and PRPs to break ground on "time-critical work," while allowing the PRPs to recruit additional participants for funding the full Phase 1 of the Portland Harbor Injury Assessment. *Id*, p. 6; Campagne Decl.,

---

[4] Although this document refers to a PLP, CERCLA uses the term PRP.

Ex. 10, p. 1. Wausau's 2008 Agreement with Siltronic covered only this *interim* payment to the NRT of $27,777.78, which was Siltronic's per capita share of the total payment of $500,000 toward Phase 1. Complaint, Ex. G, p. 2, ¶ G; Campagne Decl., Ex. 10, p. 1. That $27,777.78 payment was the subject of the court's prior Opinion and Order (docket #132).

Siltronic did not participate in the subsequent Funding and Participating Agreement for fully funding Phase 1. Campagne Decl., Ex. 13. However, in 2010 Siltronic paid $90,277.78 as its allocated share of the funding for Phase 2 of the NRDA for which it now seeks reimbursement.[5] Since Wausau believes that it had already exhausted its indemnity obligation under its policies by the time of this payment, it has refused to reimburse Siltronic. Wausau seeks summary judgment that this cost should be characterized as an indemnity cost. Granite State disagrees and characterizes it as a defense cost.[6]

Although Wausau argues that Siltronic paid $90.277.78 to fund Phase 2, in fact it was paid to reimburse the NRT for Phase 1. Under the Funding and Participation Agreement for Phase 2, Siltronic was required to pay $324,790.01; but of that sum, $90,277.78 was allocated to payment of Phase 1 costs that it previously opted not to fund ("Phase 1 make-up payment"). *Id*, Ex. 9, p. 2 & Ex. 14, p. 3. This Phase 1 make-up payment is the subject of Wausau's motion.

Although it is impossible to parse exactly which Phase 1 activities Siltronic's payment covered, Phase 1 activities as a whole are easily identifiable as defense costs under Oregon's statutory presumption. Phase 1 consisted of the following:

> 1. **Assessment Plan**: develop a plan for completing the NRDA as described in the federal regulations. This Assessment Plan aims to

---

[5] This payment was not made pursuant to the Interim FPA, but under a separate Funding and Participation Agreement for Phase 2 activities. Campagne Decl., Ex. 14. Accordingly, it not subject to Wausau's 2008 Agreement with Siltronic.

[6] Siltronic asserts that any ruling on this dispute is premature because the NRDA payments include both defense and indemnity costs.

coordinate and streamline NRDA activities and includes
background information about the Site, including potential sources
of hazardous substance released, potential pathways, and a
summary of available data to confirm exposure of natural
resources to hazardous substances.  The Plan also describes
approaches that may be used to determine and quantify injury,
resultant public losses, and damages.

2. **Three early studies**:  conduct work related to salmon, lamprey,
and osprey to help address known data gaps. . . .

3. **Public outreach**:  develop a plan for initiating public outreach
and communication for the Portland Harbor NRDA.

4. **Planning documents:**  develop documents to help guide the
NRDA process, including establishing and maintaining an
administrative record and information management system, and
developing a strategy for expeditiously resolving liability of
cooperating PLPs.

5. **Literature Review**:  review existing Site data collected as part
of the remedial process as well as other relevant data and literature
to determine injury or damages and to evaluate data gaps.

6. **Phase 2 framework**:  outline the scope of this phase.

*Id*, Ex. 18, p. 18.

An Assessment Plan generally consists of "scientific studies to identify and quantify the

negative impacts of the pollution or physical injury, including those resulting from cleanup or

other actions taken as part of a response.  Ecological studies evaluate how, and how badly,

natural resources may have been injured."  *Damage Assessment, Remediation, and Restoration*

*Program: Assessment*, Nat'l Oceanic and Atmospheric Admin., https://www.darrp.noaa.gov/

getting-restoration/assessment (last visited Feb 10, 2016).

Based on the *Endicott* approach, Phase1 funding should be classified as defense costs.

Similar to classifying DEQ oversight costs, the most functional approach is to classify each of

the four phases of the NRDA based on whether the substance of the work is primarily defense or

indemnity.  The Injury Assessment identifies the extent of the damage and involves activities

similar to "preliminary assessments, remedial investigation, risk assessments or other necessary

investigation" which are defined as defense costs in ORS 465.480(7)(a).  The other actions

(species studies, public outreach, document development, literature review, and framing Phase 2) involve early investigation and, hence, constitute defense costs.

Instead of characterizing the costs by each separate phase under the *Endicott* approach, Wausau urges the court to analyze the posture of the NRDA process as a whole. Siltronic's payment to fund Phase 1 of the NRDA reimbursed one of its adversaries, namely the EPA. In support, Wausau cites this court's prior ruling that the earlier interim Phase 1 payment of $27,777.78 by Siltronic was properly characterized as an indemnity, stating: "Paying an insured's adversary for the costs of assessing and perfecting a claim against the insured is part of the insurer's liability, not a defense cost." Opinion and Order (docket #132), p. 15. However, as Granite State readily admits, this issue was not fully briefed by the parties at that time and now requires a closer analysis.

Prior decisions in other Portland Harbor Superfund Site litigation have found that efforts to reduce an insured's ultimate indemnity costs are part of the duty to defend. In *Ash Grove Cement Co. v. Liberty Mut. Ins. Co.*, No. 3:09-cv-00239-KI, 2011 WL 2470109, at *5 (D Or June 20, 2011), Judge King addressed whether the insurer's duty to defend included paying for the insured's participation in an ADR process prior to the receiving an inquiry from EPA pursuant to § 104(e) of CERCLA.[7]  The insured argued that:

> the ADR process is intertwined with the 104(e) request and is focused on [its] liability. Most importantly, . . . its participation in the ADR process is essential to limiting its liability because it can advocate for a lower allocation prior to the EPA issuing a unilateral order which is nearly impossible to challenge.

---

[7] Section 104(e) letters seek "information from current and past landowners, tenants, and other entities believe to have information about activities that may have resulted in releases or potential threats of releases of hazardous substances . . . to be used for the purposes of determining the need for response, or choosing or taking any response action." *Ash Grove Cement Co. v. Liberty Mut. Ins. Co.*, No. 3:09-cv-00239-KI, 2010 WL 3894119, at *1 (D Or Sept. 30, 2010).

*Id*, at *6.

Refusing to decide as a matter of law that defense costs are limited to the response to the

§ 104(e) request, Judge King concluded that the ADR process:

> might be a reasonable and necessary defense cost because, in a
> practical sense, [the insured] must take part in the ADR process to
> have any chance of influencing its ultimate responsibility for
> cleanup costs at the Site . . . in spite of the fact that
> participation . . . is completely voluntary.

*Id* at *6.

Later in the same case, the insured argued that its insurers had breached their duty to

defend by failing to pay, among other costs, its fees and costs incurred to respond to the natural

resources damage claim. *Ash Grove Cement Co. v. Liberty Mut. Ins. Co.*, No. 3:09-CV-00239-

HZ, 2013 WL 4012708, at *9 (D Or Aug. 5, 2013), *amended*, No. 3:09-CV-00239-HZ, 2014 WL

837389 (D Or Mar. 3, 2014).  Judge Hernandez explained that an insured meets its burden of

recovering defense costs by showing, in part, that "the actions taken amount to a reasonable and

necessary effort to avoid or at least minimize liability."  *Id*, at *8.  Noting that "Judge King

previously found that Plaintiff's response to the 104(e) request is a defense cost," he awarded the

"fees and costs to respond to the natural resources damages claim" to the insured because they

were incurred "as a consequence of the EPA's 104(e) request" and because "the two matters are

related."  *Id*, at *9.

The focus of Phase 1 determines the extent of damage to the natural resources.  That

information may be used in Phase 2 to estimate liability.  The cooperate assessment process of

Phase 1 allows Siltronic and other polluters to potentially limit their overall liability by

facilitating settlement during Phase 2 of the Portland Harbor NRDA.  "Phase 2 is an intermediate

step not required by the federal regulations.  It will use existing information; reasoned estimates;

and conservative, simplifying assumptions to the extent practicable; and guidance in the federal

regulations, with the goal of arriving at realistic early settlements with cooperating PLPs."

Campagne Decl., Ex. 18, p. 19.  In addition to giving PRPs an arena for early settlement of their

potential liability for natural resources damage, Mr. Gladstone cogently explained how

participation in the NRDA also gives PRPs input into limiting the costs of assessing those

damages.

> With the primary purpose of Phase 1 as the development of an [Injury
> Assessment], participating PRPs wish to influence that design by limiting
> studies and expenditures for Phase 2 to only those that will be required to
> structure restoration-based settlements utilizing a Habitat Equivalency
> Analysis (HEA) approach.  This serves the [NRT's] goal of promoting
> cost-effective and expeditious restoration of natural resources, and
> benefits participating PRPs by allowing input into the process and an
> opportunity to settle potential NRD liability claims at a significant
> savings. . . .
>
> In light of [Siltronic's] potential exposure, this process presents an
> opportunity to limit assessment costs for which it will share
> liability; avoid liability for significantly higher Phase 3 assessment
> costs; achieve settlement on a more favorable restoration-based
> HEA approach; and, avoid the uncertainties of litigation with
> potentially staggering amounts of liability and additional costs
> including NRDA studies necessary for rebutting the Trustees'
> studies.

Campagne Decl., Ex. 10, pp. 1-2.

In contrast to this characterization of Siltronic's payments for participation in the NRDA

process as akin to a joint defense fund aimed at reducing both its assessment costs and ultimate

liability, Wausau argues the payments instead serve only to satisfy its indemnity obligation.  At

the conclusion of the NRDA process, the NRT will recover damages for injury to the natural

resources, costs of emergency restoration efforts, and costs for performing the NRDA.  43 CFR

§ 11.15.  It points out that payments made pursuant to Phase 1 will be credited against that

ultimate liability.  As stated in the FPA for Phase 1, the "Trustees agree to credit costs paid under

the Interim Agreement and this Agreement against the liability, if any, of the Participant for

natural resource damage assessment costs or natural resource damages." Campagne Decl., Ex. 13, p. 3, ¶ 10. Similarly, the FPA for Phase 2 states: "The Trustees consider such costs as reasonable damage assessment costs and agree that the payment of such costs will be credited against a Phase 2 Participant's natural resource liability." *Id*, Ex. 14, p. 4, ¶ 12. Even though payments for Phases 1 and 2 (including the Phase 1 make-up payment) will be credited against Siltronic's ultimate liability for natural resource damage, the fact remains that Siltronic may be able to reduce that liability by paying to participate in the NRDA process. Thus, the Phase 1 make-up payment is properly characterized pursuant to ORS 465.480(7) as defense costs. To the extent that the court's previous Opinion and Order (docket #132) characterized Siltronic's payment to NRT under the 2008 Agreement as indemnity costs, it is now amended to reflect that all work under Phase 1 of the NRDA Injury Assessment work should be characterized as defense costs.[8]

### F.  **Settlement Agreement with the EPA**

The final disputed category of payments are those made by Siltronic under the terms of a Cost Sharing Agreement ("CSA") dated September 1, 2009, with NW Natural due to commingled contamination.[9] Burr Decl. (docket #209), Ex. 1. Siltronic characterizes reimbursement of these settlement payments from Wausau as defense costs. However, Wausau contends that under Oregon law, these payments were related to remedial design activities and should be treated as indemnity costs.[10]

---

[8]  It is premature at this juncture to classify any other payments made by Siltronic's pursuant to the NRDA process.

[9]  The amount of those payments is unclear, but may be well over $400,000.00.

[10]  Siltronic asserts that any ruling on this dispute is premature because Wausau is improperly seeking an advisory opinion on the question of indemnity without first acknowledging that it has an obligation to defend. To the contrary, a case or controversy exists as between Wausau and Granite State regarding the proper characterization of costs for the purpose of determining if and when Granite State's umbrella policies are triggered.

Under the CSA, Siltronic agreed to pay 7.5% of the costs incurred to comply with obligations Siltronic and NW Natural jointly agreed to assume under an Administrative Settlement Agreement ("ASA") and Order on Consent for Removal Action negotiated with the EPA. The ASA calls for Siltronic and NW Natural to perform "a response action investigation and design activities" in the Gasco Sediments Site as described in a Statement of Work ("SOW"). Moore Decl. (docket #192), Ex. C, Part 1 ("ASA"), p. 4 (¶ 1). The Gasco Sediments Site is the area in the Willamette River on or adjacent to the former oil gasification plant, previously owned by NW Natural[11] and now partly owned by Siltronic. ASA, pp. 9-11, 14-15.

Wausau asserts that the payments were made for work performed well after the remedial investigation in order to design the remedy for early removal of in-river contamination. The project subject to the SOW is referred to as the "final sediment remedy." Moore Decl. (docket #192-1), Ex. C, Part 2 ("SOW"), p. 8. The SOW includes multiple references to designing the remedy with a preference for removal. For example, it states that the "project goal is the further characterization, studies, analysis, and design for a final remedy at the site to facilitate construction of the remedial action to begin expeditiously following issuance of a Record of Decision (ROD) for the Portland Harbor Superfund Site." *Id*. Both NW Natural and Siltronic described the work covered by their CSA as "performance of remedial design activities." Moore Decl. (docket #191), Ex. D, p. 1. Most telling**,** Siltronic's demand to Wausau for reimbursement refers to "early removal action costs." Barber Decl. (docket #190), Ex. B, p. 5. In Wausau's view, all the work under the SOW is aimed at designing and implementing a remedy for contamination of the Gasco Sediments Site, not conducting a remedial investigation.

---

[11] Portland Gas and Coke Company ("Gasco"), which changed its name to Northwest Natural Gas Company in 1958, owned and operated the oil gasification plant and by-products facility ("Gasco facility") from 1910 until it sold what is now the Siltronic property. Moore Decl. (docket #192), Ex. C, pp. 12-13. NW Natural still owns a portion of the former Gasco facility. *Id*, p. 12.

The SOW has three parts:  "investigation, Engineering Evaluation/Cost Analysis (EE/CA), and design for the Gasco Sediments Site."  SOW, p. 8.  Although the second (EE/CA) and third (design) parts constitute indemnity costs under ORS 465.480(7), Granite State argues that the first part (investigation) is a "remedial investigation" and properly characterized as a defense cost.[12]

The ASA labels the first part as a "final sediment remedial investigation."  ASA, p. 4.  A remedial investigation may include "characterization of hazardous substances, characterization of the facility, performance of baseline health and ecological risk assessments, and collection and evaluation of information relevant to the identification of hot spots of contamination."  OAR 340-122-0080(1) & (2).  To identify the exact location, quantity, or nature of the contamination, the ASA included "the further characterization, studies, analysis, and preliminary design that will lead ultimately to a final remedy at the GASCO Sediments Site."  ASA, ¶ 22, p. 22.  Moreover, the SOW identifies data gaps to "be filled by the collection and analysis of field samples relevant to conducting the EE/CA" to, among other things, "[d]etermine spatial and volumetric extents of contamination," "[e]valuate human health and ecological risks," "[e]valuate remedial alternatives on a consistent basis in the EE/CA," "[e]valuate recontamination potential," and "[d]etermine engineering characteristics of the Site sediments."  SOW, pp. 25-26.  It also notes that sampling under docks may be needed to evaluate existing assumptions as to the extent of the contamination.  *Id*, p. 26.

Granite State basically argues that all projects that involve investigation are defense costs.  However, only "remedial investigations" and "other necessary investigations" are presumed to be defense costs.  Although not expressly referenced in ORS 465.480(7), the

---

[12] At the hearing, Granite State conceded that the second part (EE/CA) is an indemnity cost because it functions as the feasibility study for the project.

administrative rules provide that removal and remedial action (indemnity costs) also "*may include investigations*, treatment, excavation and offsite disposal, engineering controls, institutional controls, any combination thereof." OAR 340-122-0115(45) (emphasis added). The question is what types of investigations fall into that latter category.

As explained by the regulations, a "remedial investigation" is a process undertaken after the preliminary assessment "*to develop the need for remedial action*." OAR 340-122-0080(1) & (2) (emphasis added). The ASA and SOW refer to several site investigations revealing that the river sediments were sufficiently contaminated with both coal tar (for which NW Natural is a PRP) and TCE (for which Siltronic is a PRP) to require a "removal response action." ASA, ¶ 13(c), (g), (i), & ¶ 14, pp. 14-19; SOW, p. 15. Thus, in 2009 when the parties entered the ASA it was clear that contaminants in the Gasco Sediment Site required cleanup, whether through remediation or removal. Accordingly, the additional investigation and data collection in the first stage of the SOW was not necessary "to develop the need for remedial action."

The preliminary assessment and remedial investigation for the Gasco Sediment Site was being completed outside the SOW. According to the sequence of work, the EPA and DEQ would complete source control measures of the groundwater and upland remediation before the final in-river sediment remedy. SOW, pp. 9-10. When performance of the SOW began, the feasibility study for Phase 1 (groundwater and transition zone water impacted by contaminants) had been reviewed by DEQ and the supporting remedial investigation was still under review. *Id*, p. 11. Likewise, DEQ was reviewing the remedial investigation and risk assessment report for Phase 2, the upland remedial action, and the feasibility study was in the preliminary planning phase. *Id*, pp. 9-10. The remedial investigations and feasibility studies for Phases 1 and 2 did not include the in-river sediment cleanup covered by the SOW.

Instead, the Gasco Sediments Site would rely on the "harbor-wide risk and FS information as it becomes available to develop a Gasco design that is consistent and fully integrated with the Harbor-wide remedy." *Id*, p. 12. The "Portland Harbor Remedial Investigation (RI) [was] almost complete and the Feasibility Study (FS) phase [was] beginning." *Id*, p. 11. This was partly because the DEQ was the lead agency on Phases 1 and 2 while the EPA provided oversight of sediment construction and riverbank remediation work (top of bank riverward) and intended for the "riverbank and sediment work [to] include one comprehensive [Endangered Species Act] evaluation." *Id*.

Contrary to Granite State's contention, the remedial investigation for the Gasco Sediment Site was either nearly or completely finished as part of the Portland Harbor Remedial Investigation. Most importantly, it was performed outside the SOW. Accordingly, the SOW does not include a "remedial investigation" to determine the need for a remedy. Instead, the work to fill in data gaps and prepare an EE/CA was necessary to design the remedy for the Gasco sediments site and is properly characterized under ORS 465.480(7) as indemnity costs.

## II.    **Independent Counsel**

### A.    **Amendments to ORS 465.483**

Wausau seeks summary judgment that it is not obligated to pay attorney fees incurred by Christopher Reive at the law firm of Jordan Ramis PC ("Jordan Ramis") since June 2013 to advise Siltronic on issues involving the Portland Harbor Superfund Site. Siltronic maintains that Wausau is required to pay these attorney fees because Mr. Reive has served as its "independent counsel" under the amendments to the Oregon Environmental Cleanup Assistance Act ("OECAA") passed by the Oregon Legislature as SB 814 and codified in ORS 465.483 as follows:

> (1) If the provisions of a general liability insurance policy impose a duty to defend upon an insurer, and the insurer has undertaken the defense of an environmental claim on behalf of an insured under a reservation of rights, or if the insured has potential liability for the environmental claim in excess of the limits of the general liability insurance policy, the insurer shall provide independent counsel to defend the insured who shall represent only the insured and not the insurer.

> (2)(a)(A) Independent counsel retained by the insurer to defend the insured under the provisions of this section must be experienced in handling the type and complexity of the environmental claim at issue.

This "independent counsel" provision applies to all environmental claims that were pending on June 10, 2013, the date of the statute's enactment. SB 814 § 8(1), 77th Leg (Or 2003). Siltronic seeks reimbursement of attorney fees it has paid to Mr. Reive since the statute's enactment.

Because Siltronic filed its original Complaint in 2011 before the OECAA was amended in June 2013, it did not expressly plead a claim under the OECAA. Therefore, Siltronic now seeks to file an amended complaint adding this claim. However, the original Complaint seeks reimbursement of "all defense costs caused by the environmental claims." Complaint, ¶ 44B. This allegation is sufficiently broad for Siltronic to seek reimbursement of attorney fees which it has paid to Mr. Reive as "independent counsel" under the amended OECAA. Accordingly, this dispute is encompassed by the current pleadings.

### B. **Undisputed Facts**

When Siltronic tendered the environmental claims at issue to Wausau in June 2003, its defense was being handled by Mr. Reive. Moore Decl. (docket #191), ¶ 8. On September 11, 2003, Wausau notified Mr. Reive that it had accepted Siltronic's tender under a reservation of rights. Reive Decl. (docket #207), ¶ 3 & Ex. 2. Thereafter, Mr. Reive discussed with Wausau's claim adjuster, Harold Moore, his representation of Siltronic, including his hourly rate and

continued ability to advise Siltronic on all other matters, including matters related to coverage

for which Wausau had asserted a reservation of rights. *Id*, ¶ 4. On January 4, 2004, Mr. Reive

informed Wausau that if he accepted the work, he would only represent the interests of Siltronic.

*Id*, ¶ 5 & Ex. 3. After a series of conversations, it was clear that Wausau did not approve of

Mr. Reive's hourly rate and would seek other counsel. *Id* ("I understand that [Wausau] has not

approved my billing rates and is seeking alternative defense counsel for [Siltronic].). Mr. Reive

requested Mr. Moore to call and discuss Wausau's legal representation of Siltronic pursuant to

its defense obligation. *Id*. On January 8, 2004, Mr. Moore contacted Mr. Reive suggesting the

use of Mr. William Earle at the law firm of Davis Rothwell as alternative defense counsel. *Id*,

¶ 6 & Ex. 4.

On or about February 11, 2004, Mr. Moore stated that he would be bringing Mr. Earle to

a meeting with Siltronic's representative and environmental consultants on March 2, 2004. *Id*,

¶ 7 & Ex. 5. On February 23, 2004, Alan Gladstone of Davis Rothwell informed Mr. Reive that

his firm had been engaged by Wausau to defend Siltronic. *Id*, ¶ 8 & Ex. 6, p. 3. Although

Siltronic did not object to Davis Rothwell's representation, it was not asked to consent. Burr

Decl., ¶ 3. It was also not asked to sign any conflict waiver letters from Davis Rothwell. *Id*. In

September 2009 after Wausau declared its 1980-86 policies exhausted, Granite State began

paying Davis Rothwell's fees. Moore Decl., ¶ 12.

After amendment of the OECAA, Siltronic sent a letter to Wausau dated November 26,

2013, stating that Siltronic had selected the law firm of Jordan Ramis as its independent counsel

and demanding that Wausau reimburse Siltronic for its fees incurred since June 10, 2013. Barber

Decl. (docket #190), Ex. A. A year later on November 26, 2014, and again on February 11,

2015, Siltronic sent additional letters to Wausau demanding payment of the fees of Jordan

Ramis. *Id*, Exs. B-C. In a letter dated May 5, 2015, Siltronic clarified that it was not requesting

that Jordan Ramis substitute as defense counsel for Davis Rothwell, but that it was "entitled to

counsel that is independent (*i.e.* does not represent both the insurer and the insured)." *Id*, Ex. D.

Mr. Reive has acted and continues to act as Siltronic's counsel since at least 2003,

advising Siltronic on a multitude of issues involving the Portland Harbor Superfund Site,

including insurance coverage issues. *Id*. In late 2014, Mr. Gladstone retired and Ilene Gaekwad

at Davis Rothwell has continued to defend Siltronic. *Id*, ¶ 9; Siltronic's Supplemental Brief

(docket #232), ¶ 1(a).

### C.   Legal Standard

A federal court interpreting Oregon law should "interpret the law as would the [Oregon]

Supreme Court." *Powell's Books, Inc. v. Kroger*, 622 F3d 1202, 1209 (9th Cir 2010) (alteration

in original). "When interpreting state law, federal courts are bound by decisions of the state's

highest court." *Alliance for Prop. Rights & Fiscal Responsibility v. City of Id. Falls*, 742 F3d

1100, 1103 (9th Cir 2013), citing *Ariz. Elec. Power Co-op., Inc. v. Berkeley*, 59 F3d 988, 991 (9th

Cir 1995). If the state's highest court has not squarely addressed the issue, the federal court

"must predict how the highest state court would decide the issue using intermediate appellate

court decisions, decisions from other jurisdictions, statutes, treatises and restatements for

guidance." *Id* at 1102, citing *Glendale Assocs., Ltd. v. N.L.R.B.*, 347 F3d 1145, 1154 (9th Cir

2003). No Oregon appellate court has yet addressed the issue of "independent counsel" under

ORS 465.483. Thus, this court must predict how the Oregon Supreme Court would decide this

issue based on other sources for guidance.

Oregon law dictates that the first step of statutory interpretation is to examine the text and

context of the statute in order "to discern the intent of the legislature." *Portland Gen. Elec. Co.*

*v. Bureau of Labor & Indus.*, 317 Or 606, 610, 859 P2d 1145, 1145 (1993) ("*PGE*"), *superseded by statute*, ORS 174.020; *see State v. Gaines*, 346 Or 160, 171, 206 P3d 1042, 1050 (2009) (explaining that ORS 174.020 did not alter the holding in *PGE* regarding the first step of statutory interpretation). "[A]fter examining text and context," the court will "consult" the legislative history, "even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis." *Gaines*, 346 Or at 172, 206 P3d at 1050–51. The "evaluative weight" given to the legislative history is for the court to determine. *Id*. At the "third[] and final step[] of the interpretive methodology," if "the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Gaines*, 346 Or at 172, 206 P3d at 1050–51.

**D.    <u>Analysis</u>**

The first subsection of ORS 465.483 states that "the insurer shall provide independent counsel," and the second subsection refers to "[i]ndependent counsel retained by the insurer." Wausau interprets this language to mean that the insurer is required not only to pay for, but also has the right to select "independent counsel" for the insured. Siltronic disagrees, arguing that, as a matter of law, the insured must select "independent counsel" because counsel can never be "independent" when representing both the insurer, who has issued a reservation of rights, and an insured.

Examining the text and context of the statute is the first step of statutory interpretation under Oregon law. The text of ORS 465.483 does not state who selects or chooses "independent counsel," but expressly allows the insurer, not the insured, to both "provide" and "retain" the "independent counsel." To "provide" simply means "to make (something) available:  to supply

(something that is wanted or needed);" and "to give something wanted to needed to (someone or something):  to supply (someone or something) with something."  Merriam Webster Dictionary, available at http://www.merriam-webster.com/dictionary.  Among other things, "retain" means "to keep in one's pay or service; specifically:  to employ by paying a retainer."  *Id*, available at http://www.merriam-webster.com/dictionary/retain.  These definitions are not particularly helpful since they could be reasonably interpreted either to require the insurer only to pay for "independent counsel" or to allow the insurer to also select the "independent counsel."

The statute also does not define the term "independent counsel," but states only that "independent counsel . . . shall represent only the insured and not the insurer." [13]  To "represent," in the legal context, means to "speak or act for (someone or something) in a court of law."  Merriam Webster Dictionary, available at www.merriam-webster.com.  Thus, "independent counsel" can speak and act only for the insured.  Although seemingly a simple concept, it is difficult to apply in the context of Oregon's ethical rules which govern counsel defending insurance cases.

Under the Oregon Rules of Professional Conduct ("RPC"), an attorney may not represent a client if doing so would create a conflict of interest.  RPC 1.7(a).  A current conflict of interest exists if:  (1) representation of one client is directly adverse to another client; (2) there is a significant risk that representing one client would materially limit the lawyer's responsibility to another client; or (3) the lawyer is related to another lawyer in the same matter.  *Id.*  Under RPC 1.9(a), lawyer may not represent a client against a former client "in the same or substantially related matter" as the lawyer represented that former client unless the lawyer has the informed

---

[13]  For purposes of this motion, Siltronic does not contest that Davis Rothwell is qualified to act as "independent counsel" because it is "experienced in handling the type and complexity of the environmental claim at issue" as required by ORS 465.483(1), (2)(a)(A).

written consent of both clients.  An attorney may represent a client despite a current conflict in limited circumstances, particularly when "each affected client gives informed consent, confirmed in writing."  RPC 1.7(b).

However, Oregon's ethical rules contain an exception with respect to counsel hired by the insurer to represent the insured.  A lawyer who represents an insured in the typical insurance defense situation in which the insurer is paying the legal fees has two clients:  the insurer and the insured.  *See* OSB Formal Ethics Op No 2005-157 (revised April 2014); OSB Formal Ethics Op No 2005-77; *see also* OSB Formal Ethics Op No 2005-30 (simultaneous representation of insurer and insured in subrogation action).  This relationship generally does not raise a conflict of interest because of the "community of interest" in defeating the underlying third-party claim against the insured.  OSB Formal Ethics Op No 2005-121, quoting ABA Formal Ethics Op No 282 (1950).  This is true even if some of the claims brought against the insured are not covered by the insurance policy.

> When an insurer defends an insured without any reservation of rights (by which the insured reserves its right to deny coverage), there is little or no opportunity for a conflict of interest because the community of interest between the insurer and insured should be complete.  When an insurer defends **subject to a reservation or rights, however, a risk of conflict is present.**

OSB Formal Ethics Op 2005-121 (emphasis added) (finding that counsel defending under reservation of rights could not file a motion to dismiss against only the covered claim and opposed by the insured).

To allow this joint representation, Oregon's ethical rules require that a lawyer hired by the insurer to defend an insured must treat the insured as "the primary client" whose protection must be the lawyer's "dominant" concern.  *See, e.g.*, ABA Informal Ethics Op No 1476 (1981); 1 Insurance chs 6, 14 (Oregon CLE 1996 & Supp 2003).  However, when the insurer requests

counsel to take action adverse to the insured's interest, it must retain other counsel to do so. *See* OSB Formal Ethics Op No 2005-121 (the insurer wishes to take some other action to protect its interests that is detrimental to the interests of the insured); OSB Formal Ethics Op No 2005-77 (direct conflict bars a lawyer from defending the insured in the underlying action while at the same time prosecuting a declaratory-judgment action to establish a lack of coverage on the insurer's behalf). These situations, in which one client is directly adverse to another client, are impermissible even if both the insurer and the insured consent. OSB Formal Ethics Op No 2005-77, at 177 n1, citing *In re Holmes*, 290 Or 173, 619 P2d 1284 (1980) (under former DR 5-105, consent would not cure actual conflict of interest between two clients).

Under Siltronic's interpretation of ORS 465.483, the Oregon legislature intended to change Oregon's ethical rules with respect to environmental claims. Instead of allowing one counsel to represent both the insured as "the primary client" and the insurer, the statute requires "independent counsel" to "represent only the insured." By using the word "only" instead of "primarily," Siltronic asserts that the statute explicitly rejects the ability of one counsel representing both the insured and the insurer under a reservation of rights due to a divergence of interest. *See Schnitzer Steel Indus., Inc. et al v. Continental Cas. Co. et al*, No. 3:10-cv-01174-MO, slip op (docket #254), at *2 (D Or Dec. 17, 2013) (citing sections of SB 814, presumably before the law was codified, and reasoning that if counsel in question "represents both the insured, Schnitzer, and the insurer, Continental, then it is not independent counsel").

Conceivably, ORS 465.483 could be interpreted in a manner consistent with Oregon's ethical rules. Given that ORS 465.483 is phrased in the present tense ("to represent"), the Oregon legislature may have intended to allow "independent counsel" selected by the insurer to represent the insured provided as long as it does not have a direct conflict, such as also

representing the insurer in another matter adverse to the insured at the same time as prohibited by RPC 1.7(a)(1).  However, that interpretation begs the question as to whether counsel hired by the insurer can ever competently represent the insured with respect to an issue on which the insurer has reserved its right to deny coverage.  When the insurer selects counsel to defend the insured under a reservation of rights, the insured typically hires its own coverage counsel.  Otherwise, the insured has no effective way to know whether the insurer's defense counsel has taken any adverse action with respect to a coverage issue.  In Siltronic's view, only counsel hired by the insured can control the outcome of a coverage issue in favor of the insured.

After examining the text and context, the next step of statutory interpretation under Oregon law is to consult the legislative history in order to determine the legislative intent. Nothing in the legislative proceedings, written testimony, or Legislative Counsel Office's report about SB 814 indicates what the legislature meant with respect to "independent counsel," except that ORS 465.483 is modeled after California Civil Code § 2860.  Gorman Decl. (docket #208), Ex. 4, pp. 27-29.  However**,** the two statutes are worded differently.  The California statute explicitly gives the insured the right to choose "independent counsel" when a conflict of interest arises:

> (a) If the provisions of a policy of insurance impose a duty to defend upon an insurer and a conflict of interest arises which creates a duty on the part of the insurer to provide independent counsel to the insured, the insurer shall provide independent counsel to represent the insured unless, at the time the insured is informed that a possible conflict may arise or does exist, the insured expressly waives, in writing, the right to independent counsel.  An insurance contract may contain a provision which sets forth the method of selecting that counsel consistent with this section.

Cal Civ Code § 2860.

That same right of the insured to choose "independent counsel" is expressly stated in other subsections as well.  Cal Civ Code, § 2860(c) ("When the insured has selected independent

counsel to represent him or her. . . ."), (d) ("When independent counsel has been selected by the insured . . . ."), (e) ("The insured may waive its right to select independent counsel."), & (f) ("Where the insured selects independent counsel pursuant to the provisions of this section . . . ."). In addition, the California statute specifically addresses when independent counsel may or may not present a conflict of interest:

> (b) For purposes of this section, a conflict of interest does not exist as to allegations or facts in the litigation for which the insurer denies coverage; **however, when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim, a conflict of interest may exist.** No conflict of interest shall be deemed to exist as to allegations of punitive damages or be deemed to exist solely because an insured is sued for an amount in excess of the insurance policy limits.

Cal Civ Code § 2860(b) (emphasis added).

In other words, when counsel retained by the insurer is defending under a reservation of rights and controls the outcome of a coverage issue (except as to punitive damages or suit for an amount in excess of the policy limits), a conflict of interest may exist. The insurer must inform the insurer of that possible conflict. Unless the insured expressly waives that conflict in writing, the insurer must "provide independent counsel to the insured" which the insured selects. California courts have found that "independent counsel" is necessary under Cal Civ Code § 2860 when a conflict of interest arises between jointly represented clients because the representation of one client is rendered less effective by reasons of the lawyer's representation of the other client. *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal App 4th 1372, 1396 (1993) (insured was entitled to an independent counsel in settlement negotiations when it refused to agree to a settlement which would exceed the coverage limits of its policy and the insurer petitioned the court for permission to settle without the insured's consent).

Although ORS 465.483 is worded quite differently, a comparison of the two statutes helps to ascertain the legislative intent. With respect to when counsel representing both the insurer and the insured has a conflict of interest, the approach of the California statute is consistent with Oregon's ethical rules. The California statute incorporates those ethical rules by equating a conflict of interest with the requirement of the insurer to provide "independent counsel," but specifically defines when and how that conflict arises and may be waived. In contrast, ORS 465.483 does not incorporate any conflict of interest language or require a conflict of interest to trigger notice by the insurer and waiver by the insured. Instead, ORS 465.483 simply equates the defense of an environmental claim under a reservation of rights with a direct conflict of interest which entitles the insured to "independent counsel" not representing the insurer. But unlike California, ORS 465.483 extends the scope of that conflict of interest by requiring "independent counsel" even when the claim exceeds the policy limits, as is so often the case in environmental claims.

It is also noteworthy that ORS 465.483 uses nearly the same language as in Cal Civ Code § 2860(a) which states that "the insurer shall provide independent counsel to represent the insured." It changes that language only slightly by replacing "represent" with "defend," which does not in any way change the meaning, and adding "who shall represent the insured and not the insurer." Even though the California statute states that "the insurer shall *provide*," as in ORS 465.483, it is clear from other language that the insured has the right to select "independent counsel" (while also permitting the insurance contract to specify "the method of selecting that counsel"). In other words, to "provide" as used in Cal Civ Code § 2860(a) means for the insurer only to pay for, but not to select, "independent counsel." Since ORS 465.483 is modeled after Cal Civ Code § 2860(a), the same wording presumably is intended to carry the same meaning.

31 – OPINION AND ORDER

The Oregon legislature could have used much clearer language by stating that the insurer defending under a reservation of rights must pay for defense counsel selected by the insured who shall not represent the insurer.  However, by comparing the language of ORS 465.483 to its model, Cal Civ Code § 2860, and by analyzing Oregon's ethical rules, this court concludes that the Oregon legislature did not intend for the insured to accept defense counsel selected by the insurer under a reservation of rights, but to select its own "independent counsel" who will be compensated by the insurer.  Because the Oregon Supreme Court must apply the same analysis under Oregon law, this court predicts that it would reach the same conclusion.  Accordingly, Wausau is obligated to pay some or all of the attorney fees incurred by Mr. Reive since June 2013 to protect Siltronic's interest adverse to Wausau on coverage issues.

By approving Wausau's continued retention of Davis Rothwell as its defense counsel, Wausau appears to argue that Siltronic consented to any potential conflict of interest and, thus, waived its rights under ORS 463.485 to reimbursement of "independent counsel" fees for Jordan Ramis.[14]  As noted above, ORS 463.485 does not contain the same language as in the California statute allowing the insured to waive its right to select "independent counsel."  Nonetheless, Oregon's ethical rules do allow a client to waive certain conflicts of interest.  RPC 1.7(b)(4), 1.8(f)(3)(1) & 1.9(b)(2).  Even so, based on the undisputed facts of this case, Siltronic's request that Davis Rothwell not be replaced cannot be construed as such a waiver.  Instead, Siltronic requested that both counsel, Jordan Ramis (as independent counsel) and David Rothwell (as defense counsel), participate in its defense.  The insured's right to "independent counsel" may well involve the need for separate counsel defending the insured in addition to counsel retained

---

[14] Both Siltronic's coverage counsel and former Senior Manager for Environmental, Health and Safety voiced their satisfaction with Davis Rothwell's services.  Moore Decl., ¶ 10.  Furthermore, in its demand letter for reimbursement of defense costs for independent counsel, Siltronic clarified that it did not want Jordan Ramis to replace Davis Rothwell as defense counsel.  *Id*; Barber Decl. (docket #190-1), ¶ 5 & Ex. D, p. 1.

by the insurer. In fact, this situation is predicted by Cal Civ Code § 2860(f) which provides that "both the counsel provided by the insurer and independent counsel selected by the insured shall be allowed to participate in all aspects of the litigation."

For these reasons, Wausau is not entitled to summary judgment on this issue.

## **ORDER**

Wausau's Motion for Partial Summary Judgment (docket #190) is GRANTED in part as to characterizing costs that Siltronic agreed to pay under a settlement agreement with the EPA as indemnity costs, and otherwise is DENIED.

DATED  March 31, 2016.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

33 – OPINION AND ORDER